## <u>ORAL ARGUMENT HAS NOT BEEN SCHEDULED</u>

### No. 10-1313

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

INDIANA UTILITY REGULATORY COMMISSION

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent.

_____

### BRIEF OF PETITIONER
### INDIANA UTILITY REGULATORY COMMISSION

_____

Eric A. Eisen                           Beth Krogel Roads (#25655-64A)
Eisen & Shapiro                         Legal Counsel, RTO/FERC Issues
10028 Woodhill Road                     Indiana Utility Regulatory Commission
Bethesda, MD 20817-1218                 101 West Washington St., Suite 1500 E
Telephone: 301-469-8590                 Indianapolis, IN 46204
Facsimile: 301-469-8120                 Telephone: 317-232-2092
Email: eric@eisen-shapiro.com           Facsimile: 317-232-6758
                                        Email: bkroads@urc.in.gov

Initial Brief Dated:  January 7, 2010

**United States Court of Appeals**
**For the District of Columbia Circuit**
_____

| | | |
|---|---|---|
| Indiana Utility Regulatory Commission, | ) | |
| Petitioner, | ) | No. 10-1313 |
| v. | ) | |
| Federal Energy Regulatory Commission, | ) | |
| Respondent. | ) | |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The Petitioner, Indiana Utility Regulatory Commission, certifies that the following are the parties, rulings, and related cases regarding this proceeding:

**A)      Parties**

The Petitioner is the Indiana Utility Regulatory Commission.  The Respondent is the Federal Energy Regulatory Commission.  The Intervenors in Support of Petitioner are American Public Power Association, American Municipal Power, Inc., and American Electric Power Service Corporation.  The Intervenors in Support of Respondent are PJM Interconnection, L.L.C., and PJM Industrial Customer Coalition.

**B)     Rulings**

This case is a Petition for Review of the following orders of the Federal

Energy Regulatory Commission:

- *Order Conditionally Accepting Proposed Tariff Revisions*, PJM

    Interconnection, L.L.C., FERC Docket Nos. ER09-701-000 and

    ER09-701-001, 128 F.E.R.C. P 61,238 (Sept. 14, 2009).

- *Order on Rehearing, Clarification, and Compliance*, PJM

    Interconnection, L.L.C., FERC Docket Nos. ER09-701-002, ER09-

    701-003, and ER09-701-004, 131 F.E.R.C. P 61,069 (Apr. 23, 2010).

**C)     Related Cases**

This case was originally filed in the United States Court of Appeals for the

Seventh Circuit, Case No. 10-2512.   Upon the granting of a motion to transfer, the

case was transferred to the United States Court of Appeals for the District of

Columbia Circuit, Case No. 10-1313.  To the best of the Petitioner's knowledge,

there are no other related cases.

Respectfully submitted,

_____

Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD 20817
        (301) 469-8590

**United States Court of Appeals**
**For the District of Columbia Circuit**
_____

| | |
|---|---|
| Indiana Utility Regulatory Commission, | ) |
| Petitioner, | )                    No. 10-1313 |
| v. | ) |
| Federal Energy Regulatory Commission, | ) |
| Respondent. | ) |

## CORPORATE DISCLOSURE STATEMENT

The Indiana Utility Regulatory Commission is a State commission as defined in the Federal Power Act, 16 U.S.C. §796(15). As such it is not required to file a corporate disclosure statement under either Federal Rule of Appellate Procedure 26.1 or Circuit Court Rule 26.1.

Respectfully submitted,

_____

Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD 20817
        (301) 469-8590

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii

GLOSSARY ...................................................................................................vi

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED FOR REVIEW .............................................................2

STATUTES AND REGULATIONS ..................................................................4

STATEMENT OF THE FACTS ........................................................................4

    I.    Background..............................................................................................4

    II.    Status Quo Ante......................................................................................5

    III.    Current Status of Indiana Retail Customer Participation in Wholesale
           Programs ..............................................................................................6

    IV.  PJM's Tariff Revisions ...........................................................................8

SUMMARY OF THE ARGUMENT ..................................................................12

STANDING ....................................................................................................15

ARGUMENT ..................................................................................................17

    I.    Standard of Review ...............................................................................17

    II.    Demand Response Under State and Federal Jurisdiction ...........................18

    III.    PJM's Tariff Revisions Violate the FERC's Rule......................................19

    IV.  FERC's Justifications for Departure From Its Rule Lack Substance
          and Thereby Fail the Test for Reasoned Decisionmaking. .........................22

    V.    The FERC Overstepped its Jurisdictional Authority by Approving a
          Registration Process That Burdens the Local Distribution Company.....28

CONCLUSION ...............................................................................................29

Certification Regarding Word Count................................................................31

Certificate of Service ......................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Alcoa, Inc. v. F.E.R.C.,*
 564 F.3d 1342 (D.C. Cir. 2009) ................................................................17

*Ala. Power Co. v. F.E.R.C.,*
993 F.2d 1557 (D.C. Cir. 1993) ................................................................27

*\*Allegheny Power v. F.E.R.C.,*
437 F.3d 1215 (D.C. Cir. 2006)...........................................................22, 27

*Bear Lake Watch, Inc. v. F.E.R.C.,*
324 F.3d 1071 (9th Cir. 2003) ..................................................................17

*\*City of Winnfield v. F.E.R.C.,*
744 F.2d 871 (D.C. Cir. 1984)...................................................................26

*\*Detroit Edison Co. v. FERC,*
334 F.3d 48 (D.C. Cir. 2003)........................................................17, 22, 29

*\*Fla. Mun. Power Agency v. F.E.R.C.,*
411 F.3d 287 (D.C. Cir. 2005) ..................................................................17

*\*Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan,*
979 F.2d 227 (D.C. Cir. 1992)...................................................................22

*Port of Seattle, Wash. v. F.E.R.C.,*
499 F.3d 1016 (9th Cir. 2007) ................................................................. 17

*SEC v. Chenery Corp.,*
318 U.S. 80, 88, 87 L.Ed. 626, 63 S. Ct. 454 (1943)........................17-18

*S. Cal. Edison Co. v. F.E.R.C.,*
603 F.3d 996 (D.C. Cir.  2010)..................................................................23

* Authorities chiefly relied on are marked with an asterisk.

*State of Wis. v. F.E.R.C.,*
104 F.3d 462 (D.C. Cir. 1997) ...................................................................17

*U.S. Dept. of Interior v. F.E.R.C.,*
952 F.2d 538 (D.C. Cir. 1992) ...................................................................17

*\*Western Resources v. F.E.R.C.,*
9 F.3d 1568, 1574 (D.C. Cir. 1993) ..........................................................22

*Western Union Corp. v. FCC*,
856 F.2d 315 (D.C. Cir. 1988). .................................................................18

## Statutes and Regulations

5 U.S.C. § 706 ............................................................................................17

5 U.S.C. § 706(2)(C) ..................................................................................18

16 U.S.C. § 796(15). ..................................................................................16

16 U.S.C. § 824 ..........................................................................................14

*16 U.S.C. § 824(b)(1) ....................................................................18, 28, 29

16 U.S.C. § 824d ..........................................................................................1

16 U.S.C. § 825g ...........................................................................................1

16 U.S.C. § 825l(a) ....................................................................................16

16 U.S.C. § 825l(b) ................................................................................2, 16

18 C.F.R. § 35.28(b)(4) ...............................................................................4

18 C.F.R. §§ 35.28(g)(1)(i)(A) ..................................................................18

*18 C.F.R. §35.28(g)(1)(iii)............................... 9, 10-11, 13, 18, 19, 20

\* Authorities chiefly relied on are marked with an asterisk.

Ind. Code § 8-1-1-1 *et seq.*........................................................................16

**Regulatory Authorities**

**Federal**

*Wholesale Competition in Regions with Organized
Energy Markets*, Order No. 719, 122 F.E.R.C. P 61,167
(Oct. 17, 2008) ("Order No. 719") ...........................................................2, 4, 18, 19

*Order on Rehearing, Wholesale Competition in Regions with
Organized Energy Markets*, Order No. 719-A, 128 F.E.R.C.
P 61-059 (Jul. 16, 2009) ("Order No. 719-A") ............. 4, 10, 13, 14, 18, 19, 20, 24

*Supplement to the Answer of PJM Interconnection, L.L.C.,*
filed on July 15, 2005, in EL05-93-000......................................................6

**State**

*In the Matter of the Commission's Investigation into Any and All
Matters Related to Commission Approval of Participation by Indiana
End-use Customers in Demand Response Programs Offered by the
Midwest ISO and PJM Interconnection*, IURC Cause No. 43566,
2010 Ind. PUC LEXIS 255 (Jul. 28, 2010)................................................. 4, 5, 7-8

*In the Matter of the Verified Joint Petition of Indiana Michigan
Power Company and I/N TEK for Approval of the Fifth Amendment
to the Contract for Electric Service*, IURC Cause No. 43300,
2007 Ind. PUC LEXIS 238 (approved Aug. 8, 2007)........................................ 6

*Joint Petition of Hess Corporation and Cast Metal Technology, Inc.
for Approval to Participate in PJM Load Response Programs*,
IURC Cause No. 43510 ..............................................................................6

* Authorities chiefly relied on are marked with an asterisk.

Order on Requests for Interim Relief, *In the Matter of the Commission's Investigation into Any and All Matters Related to Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2009 Ind. PUC LEXIS 97 (Feb. 25, 2009) ............................................7

*Petition of AK Steel Corporation for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43503, 2008 Ind. PUC LEXIS 369 (approved Sep. 3, 2008)......................................................................................... 6

*Petition of Omnisource Corporation for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43546................................. 6

*Petition of Steel Dynamic, Inc. for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43138, 2007 Ind. PUC LEXIS 224 (approved July 25, 2007) .............................................6

* Authorities chiefly relied on are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2005 Promise | A promise by PJM given in 2005 to only allow those Indiana retail customers to participate in its wholesale demand response programs that had received approval to do so by the Indiana Commission. |
| AEP | American Electric Power Company |
| Aggregator | An entity that combines the demand response of one or more end-use or retail customers |
| APA | Administrative Procedure Act |
| EDC | Electric distribution company (see also "Local distribution company") |
| End-use customer | A single location or an aggregation of locations that consume electricity; equivalent to a "retail customer" in a traditionally-regulated state like Indiana |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| IURC or Indiana Commission | Indiana Utility Regulation Commission |
| IURC Interim Order | Order on Requests for Interim Relief, *In the Matter of the Commission's Investigation into Any and All Matters Related to Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2009 Ind. PUC LEXIS 97 (Feb. 25, 2009) |
| IURC July 2010 Order | *In the Matter of the Commission's Investigation into Any and All Matters Related to* |

vi

| | |
|---|---|
| | *Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2010 Ind. PUC LEXIS 255 (Jul. 28, 2010) |
| JA | Joint Appendix |
| Kentucky PSC | Public Service Commission of Kentucky |
| Local distribution company | The retail utility in a traditionally-regulated state like Indiana, combining the functions of the EDC and the LSE in the same company. |
| LSE | Load serving entity (see also "Local Distribution Company") |
| Midwest ISO | Midwest Independent Transmission System Operator, Inc. |
| Order No. 719 | *Wholesale Competition in Regions with Organized Energy Markets*, Order No. 719, 122 F.E.R.C. P 61,167 (Oct. 17, 2008) |
| Order No. 719-A | Order on Rehearing, *Wholesale Competition in Regions with Organized Energy Markets*, Order No. 719-A, 128 F.E.R.C. P 61-059 (Jul. 16, 2009) |
| PJM | PJM Interconnection, L.L.C. |
| R. | Record Item Number from Certified Index to the Record |
| RTO | Regional transmission organization |
| Rehearing Order | *Order on Rehearing, Clarification, and Compliance*, 131 F.E.R.C. P 61,069 (Apr. 23, 2010) |

| | |
|---|---|
| Retail customer | The end-use customer or consumer of electricity in a traditionally regulated state like Indiana |
| Section 205 | Section 205 of the Federal Power Act, 16 U.S.C. § 824d |
| September 14 Order | *Order Conditionally Accepting Proposed Tariff Revisions*, 128 F.E.R.C. P 61,238 (Sep. 14, 2009) |

## JURISDICTIONAL STATEMENT

This is a Petition for Review of orders of the Federal Energy Regulatory Commission ("FERC").

On February 10, 2009, PJM Interconnection, L.L.C. ("PJM") submitted to the FERC its proposed tariff revisions pursuant to Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d ("Section 205"), and initiated a proceeding at the FERC.  R. 1, p. 1; JA _____. Petitioner Indiana Utility Regulatory Commission ("IURC" or "Indiana Commission") filed a timely Notice of Intervention and Protest on March 3, 2009, and was admitted as a party to the proceeding under 16 U.S.C. § 825g.  R. 15, pp. 1-21; JA _____. On September 14, 2009, the FERC issued its *Order Conditionally Accepting Proposed Tariff Revisions* regarding PJM's proposed tariff revisions ("September 14 Order").  R. 59, pp. 1-16; JA _____.

In accordance with 16 U.S.C. § 825l(a), the Indiana Commission sought clarification and rehearing of the September 14 Order on October 14, 2009. R. 60, pp. 1-6; JA ____.  On November 13, 2009, the FERC issued an *Order Granting Rehearing for Further Consideration*.  R. 62, p. 1; JA ____.  The FERC entered an *Order On Rehearing, Clarification and Compliance*  ("Rehearing Order") on April 23, 2010. R. 79, pp. 1-22; JA _____.

1

The Indiana Commission filed a Petition for Review in the United States Court of Appeals for the Seventh Circuit within sixty (60) days of the Rehearing Order. Case No. 10-2512 (docket entry dated June 22, 2010). Upon motion by PJM, the case was transferred to the United States Court of Appeals for the District of Columbia Circuit, where it was filed and docketed on October 7, 2010, as Case No. 10-1313.

The Indiana Commission has consistently argued that PJM's proposed tariff revisions (1) impermissibly encroach on Indiana state jurisdictional authority, (2) exceed the FERC's jurisdiction under the Federal Power Act ("FPA"), and (3) are contrary to the FERC's own rule. The Indiana Commission has asked that the FERC's orders accepting those revisions be modified, revised or set aside based upon the record. Accordingly, this Court has jurisdiction pursuant to 16 U.S.C. § 825l(b).

## ISSUES PRESENTED FOR REVIEW

In Order No. 719,[1] the FERC established rules for regional transmission organizations ("RTOs") such as PJM Interconnection, L.L.C. ("PJM") allowing for the participation of retail customers in wholesale demand response programs, providing it is done without infringing on state or local jurisdictional authority.

---

[1] *Wholesale Competition in Regions with Organized Energy Markets*, Order No. 719, 122 F.E.R.C. P 61,167 (Oct. 17, 2008) ("Order No. 719").

The Indiana Commission challenges the FERC's orders approving the manner in
which this rule was implemented in PJM's tariff.  Specifically, the Indiana
Commission raises the following issues:

1.  Whether the FERC violated its own rule when it approved a tariff that
    allows PJM to presume eligibility of certain retail customers to
    participate in a wholesale demand response program when state law
    clearly prohibits such participation.

2.  Whether the FERC's approval of the tariff under the circumstances of
    this case is unsupported by the record, is arbitrary and capricious, or is an
    abuse of discretion.

3.  Whether the FERC's order allowing PJM to indulge in a presumption for
    some retail customers that is squarely contrary to the Indiana
    Commission's order regarding the eligibility of all retail customers to
    participate in wholesale demand response programs exceeds the FERC's
    jurisdiction or is otherwise contrary to law.

4.   Whether the FERC's order approving a tariff that imposes a duty on
    distribution facilities, regulated by state commissions, to serve as
    gatekeepers for the benefit of wholesale utilities regarding the eligibility
    of retail customers to participate in wholesale utility demand response

3

programs, exceeds the FERC's jurisdiction or is otherwise contrary to law.

## STATUTES AND REGULATIONS

In accordance with Circuit Rule 28(a)(5), pertinent and applicable statutes and regulations are set forth in the Statutory and Regulatory Addendum to this brief.

## STATEMENT OF THE FACTS

### I. Background

"Demand response" is the reduction in electricity consumption either in response to increased electricity prices or to incentive payments. 18 C.F.R. § 35.28(b)(4). Demand-response programs can increase the efficient operation of markets, enhance reliability, increase awareness of energy usage, and provide competitive pressure to reduce wholesale electric prices. Order No. 719, *14-15; Order on Rehearing, *Wholesale Competition in Regions with Organized Energy Markets*, Order No. 719-A, 128 F.E.R.C. ¶61,059, *47-48 ("Order No. 719-A"); *In the Matter of the Commission's Investigation into Any and All Matters Related to Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2010 Ind. PUC LEXIS 255, *121 (Jul. 28, 2010) ("IURC July 2010 Order"). Demand-response programs are an integral

and important part of resource planning at both the retail distribution company level and the wholesale regional transmission organization ("RTO") level.

Indiana, which is a traditional cost-of-service state, has a history of encouraging its vertically-integrated retail utilities to use demand response resources at retail and of supporting the FERC's efforts to increase demand-response at the wholesale level. IURC July 2010 Order, *122-124.  This proceeding challenges the FERC's approval of some new procedures regarding retail customer participation in a new PJM wholesale demand-response program tariff.

## II.  <u>Status Quo Ante</u>

In 2005 a coalition of industrial customers filed a complaint in FERC Docket No. EL05-93-000 concerning retail participation in PJM's existing demand response programs. The Indiana Commission and the Public Service Commission of Kentucky ("Kentucky PSC") each intervened and filed separate comments.[2] PJM responded that its programs did not preclude retail customer participation, "were designed to work in tandem with, and not in contravention to, state programs,"  and that retail customers would not be enrolled without State

_____

[2] The IURC's initial Intervention and Protest is FERC Submittal 20050519-5003 and its additional comments are contained within FERC Submittal 20050621-5039. PSC Kentucky's Intervention is FERC Submittal 20050516-5076 and its additional comments are set forth in FERC Submittal 20050621-5057. The West Virginia Public Service Commission also intervened but did not file comments.

commission approval. *Supplement to the Answer of PJM Interconnection, L.L.C.,*

p. 4, filed on July 15, 2005, in EL05-93-000 (hereafter the "2005 Promise"). Based

on these assurances, the complaint was withdrawn, the proceeding was terminated,

and over time some Indiana retail customers secured Indiana Commission

authorization to participate in PJM's program.[3]

## III.    Current Status of Indiana Retail Customer Participation in Wholesale Programs

In late February of 2009, after PJM had made its first Section 205 tariff

filing at the FERC ending its 2005 Promise, the Indiana Commission issued an

order, in a then-ongoing investigation into end-user participation in wholesale

demand-response programs, to preserve the *status-quo* in Indiana:

> Indiana end-use customers are prohibited from
> participating in RTO demand response programs until
> further order of the Commission, unless such end-use
> customer has filed a petition for and received, after

---

[3] *Petition of Steel Dynamic, Inc. for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43138, 2007 Ind. PUC LEXIS 224 (approved July 25, 2007); *In the Matter of the Verified Joint Petition of Indiana Michigan Power Company and I/N TEK for Approval of the Fifth Amendment to the Contract for Electric Service*, IURC Cause No. 43300, 2007 Ind. PUC LEXIS 238 (approved Aug. 8, 2007); and *Petition of AK Steel Corporation for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43503, 2008 Ind. PUC LEXIS 369 (approved Sep. 3, 2008). Two other retail customers filed but later withdrew petitions to participate in wholesale demand response programs. *Joint Petition of Hess Corporation and Cast Metal Technology, Inc. for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43510; and *Petition of Omnisource Corporation for Approval to Participate in PJM Load Response Programs*, IURC Cause No. 43546.

hearing, an order of the Commission authorizing such participation.

Order on Requests for Interim Relief, *In the Matter of the Commission's Investigation into Any and All Matters Related to Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2009 Ind. PUC LEXIS 97 (Feb. 25, 2009) ("IURC Interim Order").

In 2010, the Indiana Commission revised this rule by allowing Indiana retail customers to participate in wholesale demand response programs through their retail utility, rather than directly, and to provide for the development of retail tariff provisions to implement such participation. *In the Matter of the Commission's Investigation into Any and All Matters Related to Commission Approval of Participation by Indiana End-use Customers in Demand Response Programs Offered by the Midwest ISO and PJM Interconnection*, IURC Cause No. 43566, 2010 Ind. PUC LEXIS 255, *136, 149 (Jul. 28, 2010) ("IURC July 2010 Order"). Until retail tariff provisions are approved, absent specific approval by the Indiana Commission, "**Indiana end-use customers shall not be enrolled or otherwise participate in RTO demand response programs directly or through curtailment service providers or other aggregators.**" (emphasis added) *Id*. at *149.

7

## IV.    <u>PJM's Tariff Revisions</u>

PJM's tariff uses a registration process to vet those proposing to enter its demand response programs. R. 1, pp. 4, 14, 18, 24-25, 27-28, 36-37, 40, 46-47, 49-50; JA ____.  Only registered participants may make bids under the program.  *Id*.

Prior to the tariff revisions at issue in this proceeding, when Indiana Commission authorization was by the 2005 Promise the predicate to retail customer requests to participate in PJM's program,  the PJM tariff required PJM to notify the local distribution company[4] of any eligible retail customer proposed registration to determine whether the local distribution company already had contractually obligated the same demand-response resource about to be bid into the wholesale programs. This avoided the risks of double counting of demand response, overstating the resource, and double recovery by the retail customer.  *Id*. The local distribution company would of necessity (in Indiana's system) be a party to the contractual obligations about which it is reporting, and would be a victim if a demand response it relied upon was double-committed, so the distribution company is both uniquely qualified to provide this information to PJM and financially interested in doing so. If the distribution company did not object, PJM

_____

[4] The PJM tariff refers to the electric distribution company ("EDC") and the load serving entity ("LSE"), which in non-traditionally regulated states can be separate entities.  However, in a traditionally regulated state like Indiana, the EDC and LSE are the same company, which is the retail utility regulated by the Indiana Commission and is best described as the "local distribution company," the term that will be used by the Indiana Commission in its filings with this court.

would assume no contrary contractual obligations exist and proceed to register and accept the bids of the demand response resource. *Id.*

In Order No. 719, issued on October 17, 2008, the FERC adopted a new rule requiring regional transmission organizations to "permit a qualified aggregator of retail customers to bid demand response on behalf of retail customers ... unless the laws and regulations of the relevant electric retail regulatory authority expressly do not permit a retail customer to participate." 18 C.F.R. §35.28(g)(1)(iii).

In its tariff revision filing in February of 2009, PJM assumed general retail customer[5] eligibility and greatly expanded the onus on the local distribution company, making it responsible for objecting to each proposed registration and for proving that participation by the customer in question is prohibited by the retail regulatory authority. R. 1, pp. 4, 14, 18, 24-25, 27-28, 36-37, 40, 46-47, 49-50; JA ____. If the local distribution company did not perform this added responsibility within ten days, the registration and subsequent bids would be allowed to proceed. *Id*.

The Indiana Commission protested regarding this process, taking issue with the tariff presumption of eligibility because the presumption was squarely contrary

---

[5] In the PJM tariff revisions, an "end-use customer" may refer to a single location or an aggregation of locations that consume electricity. First Revised Original Sheet No. 74.01, Section 1.5A. Under traditional regulation and in the State of Indiana, the term "retail customer" is most appropriate and shall be used throughout the Indiana Commission's filings in this case.

to the Indiana Commission's orders and to Order No. 719, and because the

presumption then required and imposed a new duty on local distribution companies

to act as compliance police for the Indiana Commission.  R. 15, pp. 11-19;

JA_____; R. 49, pp. 3-11; JA _____; R. 58, pp. 1-2; JA _____.

  Before it responded to the protests against PJM's new tariff, the FERC

issued Order No. 719-A on July 16, 2009. After assuring that its "intent and effect

are neither to encourage or require actions that would violate state laws or

regulations..., [that it] does not make findings about retail customers' eligibility,

under state or local laws... [that it does not authorize] a retail customer to violate

existing state laws or regulations or contract rights, [and that it leaves] to the

appropriate state or local authorities to set and enforce their own requirements,"

(Order No. 719-A, *56-57) the FERC amended the final rule to read as follows:

> Each Commission-approved independent system operator
> and regional transmission organization must accept bids
> from an aggregator of retail customers that aggregates the
> demand response of: (1) the customers of utilities that
> distributed more than 4 million megawatt-hours in the
> previous fiscal year, and (2) the customers of utilities that
> distributed 4 million megawatt-hours or less in the
> previous fiscal year, where the relevant electric retail
> regulatory authority permits such customers' demand
> response to be bid into organized markets by an
> aggregator of retail customers. **An independent system
> operator or regional transmission organization must
> not accept bids from an aggregator of retail
> customers** that aggregates the demand response of: (1)
> the customers of utilities that distributed more than 4
> million megawatt-hours in the previous fiscal year,

> **where the relevant electric retail regulatory authority
> prohibits such customers' demand response to be bid
> into organized markets by an aggregator of retail
> customers**, or (2) the customers of utilities that
> distributed 4 million megawatt-hours or less in the
> previous fiscal year, unless the relevant electric retail
> regulatory authority permits such customers' demand
> response to be bid into organized markets by an
> aggregator of retail customers.

18 C.F.R. §35.28(g)(1)(iii). (Emphasis added.)

After this, by order issued September 14, 2009, the FERC conditionally accepted PJM's new tariff filing, requiring that the tariff be revised to recognize that retail regulatory authorities may place conditions on retail customer eligibility and otherwise to comply with then just-issued Order No. 719-A. *Order Conditionally Accepting Proposed Tariff Revisions*, PJM Interconnection, L.L.C., 128 F.E.R.C. ¶ 61,238, at 62,119, ¶ 22 (Sep. 14, 2009) ("September 14 Order"). PJM's compliance filing, made the following month, inserted a presumption against participation by customers of small distribution companies but retained the original submission's presumption of legal eligibility to participate for all other customers. R. 64, pp. 6-9, 14-16, 31-38, 46-53, 62-69, 79-87, 101-110, 120-127, 138-147, 161-171; JA _____.

In its Rehearing Order issued April 23, 2010, the FERC rejected the Indiana Commission's exceptions to this compliance filing. *Order on Rehearing, Clarification, and Compliance*, PJM Interconnection, L.L.C., 131 F.E.R.C. ¶

11

61,069 (Apr. 23, 2010)("Rehearing Order").  As to the local distribution company

police function, the FERC stated:

> PJM's provision is consistent with its previously-approved registration
> process and the Indiana Commission has not shown that it is unjust or
> unreasonable. By contrast, shifting the responsibility [for proving legal
> eligibility or ineligibility]... to the aggregator would require the
> implementation of a new, parallel process that could confuse,
> complicate or delay registrations. *Id*. at 61,373, ¶11.

As to the Indiana Commission's request that "PJM should not be permitted to

accept or keep in place registrations by Indiana end-use customers that have not

complied with the Indiana Commission's requirement that these customers obtain

Indiana Commission approval prior to participation," *Id*. at 61, 377, ¶46, the FERC

said that "the end use customer may still participate" if it had a contract in place

with an aggregator by August 28, 2009,  *Id*. at 61,378, ¶50, which is six months

*after* the Indiana Commission order directing maintenance of the status quo.

## SUMMARY OF THE ARGUMENT

The issue in this proceeding is not whether the FERC has the authority to

regulate RTOs and wholesale demand response programs; nor is the issue whether

the Indiana Commission has the authority to determine the eligibility of Indiana

retail customers to participate in wholesale demand response programs.  Both the

FERC and the Indiana Commission agree that, while the FERC may authorize

wholesale demand response programs, the Indiana Commission retains the right, as

the relevant electric retail regulatory authority, to determine Indiana retail customer

eligibility for those programs. Thus, what is at issue is whether PJM's tariff revisions approved by the FERC draw the same distinction or cross the line and impermissibly interfere with the Indiana Commission's retail jurisdictional authority.

FERC recognized that its final rule concerning retail customer participation in wholesale demand response programs is at "the confluence of state and federal jurisdiction" and acknowledged the primacy of states and other retail regulatory authorities in determining retail customer eligibility for these programs. Order No. 719-A, *56. In recognition of this, the final rule draws a bright line, stating that the RTO "must not" accept bids from retail customers if the retail regulatory authority has prohibited retail customer participation. 18 C.F.R. § 35.28(g)(1)(iii).

PJM's new demand-response tariff is not consistent with the jurisdictional principles expressed in the FERC's orders because it violates the bright line of the FERC's final rule by presuming eligibility, thereby creating an irreconcilable conflict with an Indiana Commission order that requires precisely the opposite. The FERC's approving PJM's tariff revisions that are inconsistent with the FERC's own orders and in clear violation of its own final rule without plausible record justification for the departure is arbitrary and capricious and contrary to law.

The conflict with Indiana law aside, the PJM tariff revisions impose an undue burden on local distribution companies that is contrary to Section 201 of the

13

Federal Power Act, 16 U.S.C. § 824. The FERC said it "does not require a retail electric regulatory authority to make any showing or to take any action in compliance with the Final Rule." Order No. 719-A, *57. PJM's tariff deftly ducks that prohibition by drafting local distribution companies to serve as the retail electric regulatory authority's (here the Indiana Commission's) proxy police to do what the FERC says the retail authority shall not be required to do.

FERC accepts this on the ground that PJM's prior tariff included a procedure for local distribution companies providing certain contractual information to PJM in connection with retail customer participation in the same program. In contrast to the local distribution company providing information that it uniquely possessed and disclosure of which was necessary to protect the company's own interests, however, PJM's tariff revisions require the local distribution company to provide verifying documentation of the eligibility *vel non* under state law of demand-response registrants with whose demand-response tender the company may have no contractual connection. In short, this PJM tariff revision allows PJM to accept bids that the FERC says it must not accept and imperiously drafts retail companies and their regulators as unwilling agents to fix this problem. The FERC's statement of its rational for approval nonetheless of these tariff revisions fails to make the case for departure from the FERC's rule and creation of the resulting cross-

14

jurisdictional mess and the FERC's acceptance is therefore arbitrary and capricious and contrary to law.

The Indiana Commission does not contend here that the FERC cannot depart from a legislative rule for very good reason. The FERC's primary of-record explanation for allowing the tariff is blunt and simple: PJM has used this procedure before without objection.  A secondary proposed justification is equally simple to state; that RTO's should be afforded flexibility to fashion a tariff responsive to FERC's rule. These purported explanations are not adequate. Using "flexibility" to justify a departure from a rule begs the question. As to the local distribution company procedure already existing in the tariff, that procedure was *not* used before as it is proposed to be used hence - i.e., to establish legal eligibility. Moreover, the previous registration procedure had no connection to "aggregators," and was administered, at least in Indiana, so as to prevent retail customers that lacked the Indiana Commission's written permission from registering in a wholesale demand response program. In all these respects the FERC was presented with an entirely new process grafted onto a procedure previously used for other purposes.  Thus, the pre-existence of this procedure has no bearing on the justness and reasonableness of the new process, let alone whether it complied with the FERC's rule and the law. Because the FERC failed to offer a reasoned explanation

for its approval of PJM's tariff, that approval must be rejected as arbitrary and capricious.

## STANDING

The Indiana Commission is the regulatory body of the State of Indiana having jurisdiction under Ind. Code § 8-1-1-1 *et seq.*, to regulate the rates and charges for the sale of electric energy to consumers in Indiana. As such, the Indiana Commission is a "State commission" under Federal law. 16 U.S.C. § 796(15). In furtherance of its regulatory charge and interests, the Indiana Commission fully participated in the proceeding below before the FERC and sought rehearing pursuant to Section 313(a) of the Federal Power Act, 16 U.S.C. § 825l(a). It is aggrieved by the FERC's actions below because its orders and its jurisdiction are compromised by the FERC's rulings. Specifically, those rulings authorize a wholesale utility to engage in a transaction with a retail Indiana customer that is illegal under Indiana law and does not permit the Indiana Commission to stop the transaction by informing the wholesale utility that the transaction is illegal. The Indiana Commission is authorized to obtain review in this Court by Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b). Consequently, the Indiana Commission has standing to maintain this action.

# ARGUMENT

### I.  Standard of Review

Section 706 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706, charges this Court to "review the whole record or those parts of it cited by a party" and "set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; *Alcoa, Inc. v. F.E.R.C.,* 564 F.3d 1342, 1347 (D.C. Cir. 2009). Under this standard, FERC must support its decision with substantial evidence in the record and reasoned decision-making. *State of Wis. v. F.E.R.C.,* 104 F.3d 462, 467 (D.C. Cir. 1997). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Port of Seattle, Wash. v. F.E.R.C.,* 499 F.3d 1016, 1026 (9th Cir. 2007) (quoting *Bear Lake Watch, Inc. v. F.E.R.C.,* 324 F.3d 1071, 1076 (9th Cir. 2003)). The standard for reasoned decision-making "requires 'an examination of relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made.'" *State of Wis. v. F.E.R.C.,* 104 F.3d 462, 467 (D.C. Cir. 1997). (quoting *U.S. Dept. of Interior v. F.E.R.C.,* 952 F.2d 538, 543 (D.C. Cir. 1992).

The reviewing court "may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review. S*ee SEC v. Chenery*

*Corp.*, 318 U.S. 80, 88, 87 L.Ed. 626, 63 S. Ct. 454 (1943). "[P]ost hoc

rationalizations by agency counsel will not suffice." *Western Union Corp. v.*

*F.C.C.*, 856 F.2d 315, 318 (D.C. Cir. 1988).  S*ee also Florida Municipal Power*

*Agency v F.E.R.C.*, 411 F.3d 287 (D.C. Cir. 2005). In addition, the reviewing court

must "hold unlawful and set aside" any agency action found to be "in excess of

statutory jurisdiction."  5 U.S.C. § 706(2)(C).  *See Detroit Edison Co. v. FERC*,

334 F.3d 48, 54-55 (D.C. Cir. 2003).

## II.    Demand Response Under State and Federal Jurisdiction

Section 201 of the Federal Power Act grants the FERC jurisdiction over the

"transmission of electric energy in interstate commerce[,] …the sale of electric

energy at wholesale in interstate commerce, and the facilities used for such

transmission and wholesale transactions."  16 U.S.C. § 824(b)(1).  This grant is

coupled with an explicit limitation; states retain jurisdiction "over facilities used in

local distribution."[6]  *Id*.

When it issued Orders No. 719 and No. 719-A, the FERC recognized that

this jurisdictional dividing line loomed over the subject of retail customer

participation in wholesale demand response programs.  Order 719-A,  *56.

Accordingly, the FERC did not "challenge the role of states and others to decide

---

[6] In a traditionally-regulated state like Indiana, the local electric distribution
companies are the retail utilities under the jurisdiction of the Indiana Commission.
For clarity, the term "local distribution company" will be used to refer to these
local retail utilities.

the eligibility of retail customers to provide demand response" for wholesale

demand response programs. *Id*., \*51. To the contrary, the final rule specifically

provides that RTOs must comply with the retail regulatory authority's rules or

orders regarding the eligibility of retail customers, 18 C.F.R. §§ 35.28(g)(1)(i)(A)

and § 35.28(g)(1)(iii), and "must not accept bids….where the relevant electric

retail regulatory authority prohibits such customers' demand response to be bid…"

18 C.F.R. § 35.28(g)(1)(iii).  As to these matters, Order Nos. 719 and 719-A and

the final rule promulgated by those orders strike an appropriate balance between

federal and state jurisdictional authority.

**III.     PJM's Tariff Revisions Violate the FERC's Rule**

The FERC's final rule states that an RTO "must not accept bids…where the

relevant electric retail regulatory authority prohibits such customers' demand

response to be bid…"  18 C.F.R. § 35.28(g)(1)(iii).  The rule could not be more

clear; PJM may not allow retail customers to participate in PJM's bidding process

where such participation is contrary to state law. However, in the substantial

revisions PJM made to its tariff and registration processes, it added a presumption

of retail customer eligibility if the local distribution company fails to participate in

the object-and-prove process.  This presumption is contrary to the clear and

unambiguous orders of the Indiana Commission, which prohibit retail customer

participation in wholesale demand-response programs unless the retail customer

has received specific approval from the Indiana Commission.  As a result, the PJM tariff revisions violate the bright line of the FERC's final rule.

It could be argued that, because the final rule (as amended and adopted by Order No. 719-A) contains presumptions regarding retail customer eligibility, then the presumption contained in PJM's tariff revisions is allowed.  This assertion ignores the significant difference in what is being presumed in the FERC's final rule versus the presumption in PJM's tariff revisions.

Stated simply, the presumption in the FERC's final rule is, for large utilities,[7] the retail customer is presumed to be eligible unless the retail regulatory authority has prohibited it; for small utilities,[8] the retail customer is presumed to be ineligible unless the retail regulatory authority has permitted it.   Order No. 719-A, *52-53.  These final rule presumptions act so (1) retail regulatory authorities of large utilities would not have to act in order to allow participation and (2) retail regulatory authorities of small utilities, which are more likely to not allow participation and/or to be their own aggregator, would not have to act to prevent participation.  *Id*.  FERC deemed these presumptions necessary in order not to burden or require the taking of action by retail regulatory authorities, who are not

---

[7] The FERC has defined a large utility as having more than 4 million mega-watt hours of distribution annually.  Order No. 719-A, *52-53.

[8] The FERC has defined a small utility as having 4 million mega-watt hours or less of distribution annually.  Order No. 719-A,*52-53.

regulated by the FERC.  *Id*., *57.  However, once a retail regulatory authority (like the Indiana Commission) has taken action regarding retail customer eligibility, the final rule is very clear that the RTO <u>must</u> fully recognize and act in accordance with the retail regulatory authority's action.  18 C.F.R. § 35.28(g)(1)(iii).

In contrast, the presumptions in PJM's tariff revisions allow it to ignore the lawful jurisdictional action of the retail regulatory authority, in direct violation of the FERC's final rule, for PJM's own internal registration process.  It is not just and reasonable for a mere registration process to be allowed to trump the authorized action of the appropriate jurisdictional authority.  Under the FERC's final rule, PJM is not allowed to ignore the retail regulatory authority's prohibition on retail customer participation.

To be fair, the FERC's September 14 Order does contain paragraphs that suggest that, once PJM knows a retail regulatory authority has prohibited retail customer participation, PJM must comply and either not register or terminate any affected registrations.  September 14 Order, 128 F.E.R.C. ¶ 61,238 at 62,119, 62,121, 62,122.  However, those requirements are not explicit in PJM's tariff, which only provides for termination or not registering a retail customer upon objection of the local distribution company.   PJM evidently considers its registration process as overriding the authorized actions of the appropriate

21

jurisdictional authority.  Consequently, considering PJM will act only in accordance with its tariff, it is important that PJM's tariff be revised to fully comply with the FERC's final rule; otherwise, PJM will register Indiana retail customers in violation of Indiana law and the FERC's final rule.

The FERC's final rule is clear.  That PJM's Section 205 tariff filing violates that rule is similarly patent: PJM is allowed to register customers whose participation in PJM's program is contrary to state law and PJM reads its tariff authority as allowing it to do this even when PJM actually knows the transaction violates state law.

## IV.   FERC's Justifications for Departure From Its Rule Lack Substance and Thereby Fail The Test for Reasoned Decisionmaking

The FERC is bound by its legislative rule until the rule is amended or revoked. *National Family Planning and Reproductive Health Association v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992). The FERC's approval of PJM's registration process, because it allows an ineligible retail customer's bids to be accepted, clearly deviates from the FERC's unambiguous rule. The FERC must at least justify its departure from its rule by demonstrating a rational nexus between the facts and its actions.  *Detroit Edison*, *supra* 334 F.3d at 54 ; *Western Resources v. F.E.R.C.,* 9 F.3d 1568, 1574 (D.C. Cir. 1993).  More than a cursory treatment by the FERC should be required. *Allegheny Power*, 437 F.3d  1215 at 1225 (D.C. Cir.

2006).  *See  S. Cal. Edison Co. v. F.E.R.C.,* 603 F.3d 996, 1000-1001 (D.C. Cir.

2010).

The reasons the FERC gives for approving PJM's proposed registration

process are (1) that it accepts PJM's explanation that PJM has always done

registration in this manner, (2) to change PJM's process would cause too much

confusion, and (3) that the Indiana Commission failed to show that the registration

process in the prior tariff was unjust or unreasonable.  Rehearing Order, ¶ 11.

Each of these offerings when parsed lack substance.

     1.    **PJM's Use of a Pre-Existing Process Does Not Relieve the FERC of the Duty to Determine Whether the Resulting Process Violates the FERC's Rule.**

That new tariff provisions make use of an existing process does not prove

that the new process is just and reasonable, particularly where the new provisions

involve new actors (aggregators) and assumptions about state law that were not

involved in the old system.

PJM's previously in-place process *made room* for the local distribution

company to report only on contracts for demand response to which the local

distribution company would have been a party with direct first-hand knowledge of

those contracts and would have had good business and legal reasons to be

responsive to requests for information about them. R. 1, pp. 4, 14, 18, 24-25, 27-

28, 36-37, 40, 46-47, 49-50; JA _____.   It had an entirely different purpose that

that of the new process – to assure that offered demand response is practically available and not already subject to contract; in other words to ensure that demand response doesn't get double counted in calculating resources. As the local distribution company was necessarily part of the contracts regarding which PJM is inquiring, it is in the best position to provide that information.

PJM's new process requires the local distribution company to report about transactions in which it plays no part and has no direct business interest, and regarding which it has less knowledge that those who are directly involved, in order to prove that the customer's participation in a demand response program is illegal. R. 64, pp. 6-9, 14-16, 31-38, 46-53, 62-69, 79-87, 101-110, 120-127, 138-147, 161-171; JA _____. As such, the proposed registration process puts an additional and very different burden on the local distribution company in connection with demand response program transactions as to which it is not a part.

PJM's accepted tariff also violates the language of Order No.719 by imposing on the local distribution companies regulated by retail regulatory authorities the exact burden of taking action that the FERC explicitly said its rule would not place on the retail regulatory authorities. Order No.719-A, *57. Any doubt that PJM's tariff seeks to use the local distribution company as a proxy police force for the retail regulatory authority from which it may not directly demand action is laid to rest by a new rationale advanced by the FERC in its April

24

23 Order on Rehearing in support of accepting PJM's tariff proposal to the effect

that the retail regulatory authority will police PJM's proxy police force:

> In addition, we find PJM's existing procedure to be just and reasonable, given that the retail utility is subject to the authority of the retail regulator. Given this direct regulatory nexus, we are satisfied that the retail regulatory authority will be able to exercise its full regulatory authority over the retail utility.

April 23 Order (¶ 11).  How is the Indiana Commission's oversight of local

distribution company policing functions under PJM's tariff not imposing a burden

of taking action on the Indiana Commission? PJM's tariff should not be allowed to

circumvent the FERC's reasonable intent of not burdening or placing requirements

on entities (including state commissions) it does not regulate.

2.    **PJM's Proposed Multi-Tier Registration System is Inefficient and Confusing**

The FERC's second justification -that actually following Indiana law and

denying retail customers eligibility absent the Indiana Commission's customer-

specific order of exception-on-petition would cause too much confusion and delay-

is simply baffling. PJM's tariff implements for the first time (as this is not the way

it was previously done) a dual system with *opposite* presumptions depending on

the size of the local distribution company serving a retail customer that wishes to

participate in PJM's program. Why is a standard that sometimes conflicts and

sometimes follows state law less confusing than a standard that simply follows

state law? How is it less confusing to require a stranger to a transaction to serve as

the guarantor of the eligibility of a participant than it is to require an associated and involved participant to guaranty eligibility? How is requiring the new actor, the aggregator, to take on this responsibility a "shifting" of responsibility when the responsibility didn't previously exist at all? Why would it be more confusing to require the proposed aggregator of retail load to prove the legal eligibility of the resources it tenders than to require a stranger to the transaction to disprove the legal eligibility of those resources? Why does the aggregator of a proposed load have less incentive to expedite clearance of the load than a retail distribution company that is not involved in the transaction? The FERC fails to address any of this.

### 3.  The Indiana Commission Need Not Show That The Pre-Existing Process Used for Other Purposes Is Unjust and Unreasonable

FERC's final offered justification for accepting PJM's proposed registration methodology is that the Indiana Commission did not make a showing that the prior registration process was unjust and unreasonable. It is true that PJM did not have to prove the continued reasonableness of the unchanged portions of its registration process. *City of Winnfield v. F.E.R.C.*, 744 F2d 871, 877 (D.C. Cir. 1984). However, the Indiana Commission is not challenging the prior registration process as applied to the matters to which it previously applied; it is challenging the significant changes made for a new purpose.  The statute and case law are clear that, in a Section 205 proceeding, the party filing the change bears the burden of

26

proof that the change is lawful.  FPA 205(e), 16 U.S.C. 824d(e).  *See  Allegheny Power*, 437 F.3d at 1219 ; *Ala. Power Co. et al. v. F.E.R.C. et al*., 993 F.2d 1557, 1571 (D.C. Cir. 1993); and *Winnfield* , 744 F.2d  at 877 .  In this matter, that party with the burden is PJM.

PJM's glib reasoning in support of its proposed tariff changes is that it needs to keep its prior registration process in order to avoid confusion.  However, this purported reasoning ignores not only the extent and quality of the change PJM is making to its tariff, but also the fact that PJM's presumption of eligibility is completely contradicted by the clear statement of the FERC's rule.

If the Indiana Commission needs to rebut anything in this matter, its showing that PJM's tariff on its face in fact violates the FERC's rule and that it ignores the Indiana Commission's lawful order which FERC's rule requires PJM to follow in dealings with retail customers should certainly be sufficient to show that PJM's new registration process is unjust and unreasonable. It is certainly sufficient to require the FERC to offer a reasoned justification to violate its own rule and allow a utility subject to its jurisdiction (1) to enter into transactions with retail customers prohibited under state law and (2) to draft state-regulated local distribution companies as functionaries.

The FERC's focus on the Indiana Commission's burden completely failed to take into account the quality of the change PJM proposed, the minimal support for

27

PJM effecting this change, and the fact that PJM's presumption of eligibility results in violations of the FERC's own rule. The question at issue now does not involve whether the prior tariff was just and reasonable, but whether the tariff changes as proposed by PJM comply with the new final rule and are reasonable under the circumstances. Because PJM's tariff revisions fail to comply with the FERC's final rule and are unsupported by substantial evidence on the whole record as to why such non-compliance is allowable, the FERC acceptance of those revisions is arbitrary and capricious and contrary to law.

**V.      The FERC Overstepped its Jurisdictional Authority by Approving a Registration Process That Burdens the Local Distribution Company.**

PJM's tariff revisions make local distribution companies in Indiana the agents of the Indiana Commission, required to act as gatekeepers for the benefit of a wholesale utility and its demand response programs. It is worth noting that the same tariff revisions do not allow the Indiana Commission to do this directly. Even if the Indiana Commission learns of an ineligible retail customer proposing to participate in PJM's program, its communication of that fact to PJM is irrelevant under PJM's tariff. Moreover, the Indiana Commission has not authorized any local distribution company in Indiana to speak or act on its behalf.

The Federal Power Act specifically reserves jurisdictional authority over local distribution facilities to the states. 16 U.S.C. § 824(b)(1). The FERC may not require local distribution company actions that interfere with a state's regulation of

28

such companies.  Requiring a local distribution company to serve as the unauthorized agent of the state regulator, a role for which the local distribution company does not have legal authority in Indiana, crosses this line and seeks to rewrite Section 201(b)(1) of the Federal Power Act, 16 U.S.C. § 824(b)(1).  *Detroit Edison*, *supra* 334 F.3d at 54-55.

## CONCLUSION

Because PJM's proposed tariff revisions allow retail customer participation that has been prohibited by the Indiana Commission, a retail regulatory authority, and therefore do not comply with FERC's rules, those tariff provisions should have been found to be unjust and unreasonable by FERC.  By approving tariff provisions that violate its own rules, FERC's decision is arbitrary and capricious. By approving tariff provisions that unduly burden the state jurisdictional local distribution company directly and (the Indiana Commission indirectly) and interfere with the regulatory authority of the Indiana Commission, the FERC has acted in excess of its statutory authority and its action must be held unlawful and set aside.

WHEREFORE, the Indiana Commission respectfully requests that this court vacate FERC's decision and remand this proceeding to FERC to reconsider and revise its determination regarding PJM's tariff compliance filing accordingly.

Respectfully submitted,

By: ————————————————————

Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD 20817-1218
Telephone: 301-469-8590
Facsimile: 301-469-8120

Email: eric@eisen-shapiro.com

————————————————————

Beth Krogel Roads
Legal Counsel, RTO/FERC Issues
Indiana Utility Regulatory Commission
101 West Washington Street,
Suite 1500 East
Indianapolis, IN 46204

Attorneys for IURC

## CERTIFICATION REGARDING WORD COUNT

The undersigned, counsel for Petitioner Indiana Utility Regulatory Commission, certifies pursuant to Fed. R. App. P. and Circuit Court Rule 32(a)(7) that this brief complies with the type-volume requirements of the Court. Based on the word count of the word processing system (Microsoft Word) used to prepare the brief, the brief contains 7275 words, including words in footnotes, but excluding the parts listed in Fed. R. App. P. 32(a)(7)(B)(iii) and thus complies with the 14,000 word limitation.

This Brief has been prepared in a proportionately spaced type face, using Microsoft Word in font size 14, Times New Roman.

_____
Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD 20817-1218
Telephone: 301-469-8590
Facsimile: 301-469-8120

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of January, 2011, I caused the Petitioner's Brief of the Indiana Utility Regulatory Commission, to be served on the following parties by electronic means in accordance with Circuit Rule 25:

**Federal Energy Regulatory Commission**
Samuel Soopper, Attorney
Federal Energy Regulatory Commission
888 1st Street, N.E.
Washington, D.C. 20426
Samuel.Soopper@ferc.gov

**American Public Power Association**
Randolph Lee Elliott
Miller, Balis & O'Neil, P.C.
1015 – 15th Street, N.W., Twelfth Floor
Washington, D.C. 20005
relliott@mbolaw.com

**American Municipal Power, Inc.**
Gary J. Newell
Thompson Coburn
1909 K St., N.W., Suite 600
Washington, D.C. 20006-1167
gnewell@thompsoncoburn.com

**American Electric Power Service Corp**.
Steven J. Ross
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
sross@steptoe.com

Steven T. Nourse, Senior Counsel
American Electric Power Service Corp.

1 Riverside Plaza, 29th Floor

32

Columbus, OH 43215
stnourse@aep.com

Monique Rowtham-Kennedy, Sr. Counsel
American Electric Power Service Corp.
801 Pennsylvania Ave., N.W., Suite 320
Washington, D.C. 20004
kennedy@aep.com

**PJM Industrial Customer Coalition**
Robert A. Weishaar, Jr.
McNees, Wallace & Nurick, LLC
777 N. Capitol St., N.E., Suite 401
Washington, D.C. 20002-4292
rweishaar@mwn.com

**PJM Interconnection, L.L.C.**
Barry S. Spector
Wright & Talisman, P.C.
1200 G St., N.W., Suite 600
Washington, D.C. 20005
spector@wrightlaw.com

Eric A. Eisen
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD 20817-1218
Telephone: 301-469-8590
Facsimile: 301-469-8120
Email:eric@eisen-shapiro.com

33

# Statutory and Regulation Addendum

## TABLE OF CONTENTS

STATUTES

5 U.S.C. §706 ……………………………………………………… A-1

16 U.S.C. § 796(15) ……………………………………………... A-2

16 U.S.C. § 824 ………………………………………………….. A-3

16 U.S.C. § 824d ………………………………………………… A-6

16 U.S.C. § 825g ………………………………………………… A-9

16 U.S.C. § 825l ………………………………………………… A-10

IC 8-1-1 …………………………………………………………... A-12

REGULATIONS

18 C.F.R. § 35.28 ………………………………………………… A-18

**5 U.S.C. § 706**

**Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> **(1)** compel agency action unlawfully withheld or unreasonably delayed; and
>
> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> **(B)** contrary to constitutional right, power, privilege, or immunity;
>>
>> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> **(D)** without observance of procedure required by law;
>>
>> **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>
>> **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

A-1

**16 U.S.C. § 796(15)**

## Definitions

The words defined in this section shall have the following meanings for purposes of this chapter, to wit:

$$[\ldots]$$

(15) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of electric energy to consumers within the State or municipality;

A-2

## 16 U.S.C. § 824

**Declaration of policy; application of subchapter**

### (a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

### (b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j-1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes

A-3

specified in the preceding sentence.

## (c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

## (d) ``Sale of electric energy at wholesale'' defined

The term ``sale of electric energy at wholesale'' when used in this subchapter, means a sale of electric energy to any person for resale.

## (e) ``Public utility'' defined

The term ``public utility'' when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),\1\ 824i, 824j, 824j-1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

---------------------------------------------------------------------------

\1\ So in original. Section 824e of this title does not contain a subsec. (f).

---------------------------------------------------------------------------

## (f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

A-4

## (g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of--

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall--

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms ``affiliate'', ``associate company'', ``electric utility company'', ``holding company'', ``subsidiary company'', and ``exempt wholesale generator'' shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

A-5

## 16 USC § 824d

### Rates and charges; schedules; suspension of new rates; automatic adjustment clauses

(a) Just and reasonable rates. All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful. No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules. Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes. Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

A-6

(e) Suspension of new rates; hearings; five month period. Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause".

(1) Not later than 2 years after the date of the enactment of this subsection [Nov. 9, 1978] and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine--

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are--

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to--

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

## 16 U.S.C. § 825g

### Hearings; rules of procedure

a) Hearings under this chapter may be held before the Commission, any member or members thereof or any representative of the Commission designated by it, and appropriate records thereof shall be kept. In any proceeding before it, the Commission, in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

(b) All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

## 16 U.S.C. § 825*l*

### Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric-utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the

A-10

application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

## (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

A-11

## IC 8-1-1

### Utility Regulatory Commission

**IC 8-1-1-1 "Commission" defined**    Sec. 1. As used in this article, "commission" refers to the Indiana utility regulatory commission

### IC 8-1-1-2 Creation of commission; membership; term of office; chairman
Sec. 2. (a) There is created the Indiana utility regulatory commission which shall consist of five (5) members, at least one (1) of whom shall be an attorney qualified to practice law before the supreme court of Indiana and not more than three (3) of whom belong to the same political party.    (b) The members of the commission and all vacancies occurring therein shall be appointed by the governor from among persons nominated by the nominating committee in accordance with the provisions of IC 8-1-1.5.    (c) The members may be removed at any time by the governor for cause.    (d) The governor shall appoint one (1) member as chairman.    (e) The members of the commission shall be appointed for a term of four (4) years, except when a member is appointed to fill a vacancy, in which case such appointment shall be for such unexpired term only. All members of said commission shall serve as such until their successors are duly appointed and qualified, and while so serving shall devote full time to the duties of the commission and shall not be actively engaged in any other occupation, profession, or business that constitutes a conflict of interest or otherwise interferes with carrying out their duties as commissioners.    (f) A member of the commission or any person appointed to any position or employed in any capacity to serve the commission, may not have any official or professional relationship or connection with, or hold any stock or securities or have any pecuniary interest in any public utility operating in Indiana.    (g) Each member appointed to the Indiana utility regulatory commission shall take and subscribe to an oath in writing that he will faithfully perform the duties of his office, and support and defend to the best of his ability the Constitution and laws of the state of Indiana and of the United States of America, and such oath shall be filed with the secretary of state.    (h) The chairman of the commission shall assign cases to the various members of the commission or to administrative law judges for hearings.

### IC 8-1-1-3 Organization of commission; administrative law judges; investigation and hearing; bond; powers and duties    Sec. 3. (a) The members of the commission shall meet and organize the commission. The commission may, subject to the approval of the governor, appoint a secretary of the commission.    (b) The salaries of the members and secretary of the commission

A-12

shall be fixed by the governor, subject to the approval of the budget agency; however, the salaries of the chairman and the members shall not be less than the following annual minimum amounts:    (1) For the chairman, sixty-five thousand dollars ($65,000).    (2) For the members, sixty thousand dollars ($60,000) each.    (c) The commission may appoint one (1) or more administrative law judges who shall be responsible to and serve at the will and pleasure of the commission. While serving, the administrative law judges shall devote full time to the duties of the commission and shall not be actively engaged in any other occupation, profession, or business that constitutes a conflict of interest or otherwise interferes with carrying out their duties as administrative law judges. The salary of each administrative law judge shall be fixed by the commission subject to the approval of the budget agency but may not be less than the following annual amounts:    (1) For the chief administrative law judge, forty-five thousand dollars ($45,000).    (2) For all other administrative law judges, forty thousand dollars ($40,000).    (d) A majority of the commission members shall constitute a quorum.    (e) On order of the commission any one (1) member of the commission, or an administrative law judge, may conduct a hearing, or investigation, and take evidence therein, and report the same to the commission for its consideration and action; however, a hearing concerning a request for a general increase in the basic rates and charges of a utility in an amount exceeding twenty million dollars ($20,000,000) may only be conducted by one (1) or more commission members.    (f) Each member of the commission shall give bond in the sum of ten thousand dollars ($10,000) for the faithful performance of his duties. Such bond shall be filed with the secretary of state.    (g) The commission shall formulate rules necessary or appropriate to carry out the provisions of this chapter, and shall perform the duties imposed by law upon them. (h) The commission may:    (1) employ, with the approval of the governor and the state budget agency, sufficient professional staff, including but not limited to specialists, technicians, and analysts, who are exempt from the job classifications and compensation schedules established under IC 4-15; and    (2) purchase, lease, or otherwise acquire for its internal use sufficient technical equipment necessary for the commission to carry out its statutory duties.

**IC 8-1-1-4.1 Payment of expenses**    Sec. 4.1. Any expense incurred by the commission, either upon complaint against any public utility, or upon petition of any public utility shall be charged and paid in the manner provided in IC 8-1-2-70 or IC 8-1-6, whichever is appropriate under the circumstances.

**IC 8-1-1-5 Impartiality of commission; evidence; record; utility consumer counselor; ex parte communications; executive sessions; violations**    Sec. 5.

A-13

(a) The commission shall in all controversial proceedings heard by it be an impartial fact-finding body and shall make its orders in such cases upon the facts impartially found by it. The commission shall in no such proceeding, during the hearing, act in the role either of a proponent or opponent on any issue to be decided by it. All evidence given in any such proceeding shall be offered on behalf of the respective parties to, or appearing in, the proceeding and not in the name or behalf of the commission itself.      (b) Any report, audit, examination, or analysis prepared by the commission staff at the request or direction of the commission may be made a part of the record of the proceeding, subject to cross-examination by any party of the person who performed or directed the preparation of the report, audit, examination, or analysis.      (c) If in any such proceeding the public interest is not otherwise adequately represented by counsel, in the opinion of the commission, it shall be the duty of the utility consumer counselor, if requested by the commission, to make adequate preparation for the presentation of the interests of the public in such proceeding and the utility consumer counselor shall at the hearing represent the public interests therein involved.      (d) However, nothing in this section prevents the commission from instituting, prosecuting, hearing, or determining any investigation or proceeding which it is authorized to do, or make, on its own motion by any law with the administration of which it is charged.      (e) Except as otherwise provided in this chapter, no member or employee of the commission assigned to make findings of fact and conclusions of law in a formally docketed evidentiary proceeding may communicate in connection with any issue of fact or law disputed in that proceeding with any party or any party's representative, except on notice and with opportunity for all parties to participate.      (f) In addition to holding an executive session in the instances described in IC 5-14-1.5-6.1(b), the commission may hold an executive session to deliberate on a proposed order if all the following are satisfied:      (1) All evidence on the matter has been received by the commission.      (2) The deliberations are preparatory to taking final action on an order subject to judicial review.      (3) Only the following are permitted to participate in the executive session:      (A) Commission members.      (B) Commission employees who are formally assigned to advise or assist in preparing the order, including the commission's technical staff and attorneys. IC 5-14-1.5-5, IC 5-14-1.5-6.1, and IC 5-14-1.5-7 apply to an executive session held under this subsection.      (g) A person who violates this section commits a Class C infraction

### IC 8-1-1-7 Survival, actions, or appeals pending before abolished
**commission**      Sec. 7. Where in any statute or rule provision is made for an appeal from, or action against, the public service commission, or an appeal from, or action against, the public service commission of Indiana, such appeals or actions may be taken from or brought against the Indiana utility regulatory commission. Wherever

in any statute or rule in force after July 1, 1987, there appears in any provision the name "public service commission" or the name "public service commission of Indiana" the name "Indiana utility regulatory commission" is in each case substituted in its place.

**IC 8-1-1-8 Hearings; publication of notice**    Sec. 8. (a) Notwithstanding any other statute relative to the publication of notice of hearings to be held by the utility regulatory commission, publication of notice of hearings to be held by the commission shall be made only in accordance with this chapter.    (b) Whenever the utility regulatory commission shall order a hearing in any proceeding instituted by or against any public utility, notice of the hearing shall be given by one (1) publication appearing not less than ten (10) days prior to the date fixed for the hearing in two (2) newspapers of general circulation published in one (1) county wherein reside patrons or customers of the public utility who might be affected by an order made by the commission pursuant to the hearing. If two (2) newspapers of general circulation are not published in the county, then one (1) publication appearing not less than ten (10) days prior to the date fixed for the hearing in one (1) newspaper of general circulation published in the county shall be sufficient. If no newspaper of general circulation is published in the county, then the commission shall cause notice of the hearing to be given by one (1) publication appearing not less than ten (10) days prior to the date fixed for the hearing in two (2) newspapers of general circulation published in a county adjoining the county wherein reside patrons or customers of the public utility who might be affected by the order.    (c) Whenever the department of state revenue orders a hearing in any proceeding instituted by or against a motor vehicle carrier, notice of such hearing shall be given by one (1) publication appearing not less than ten (10) days prior to the date fixed for such hearing in two (2) newspapers of general circulation published in the county where such motor vehicle carrier has its principal office or place of business. If two (2) newspapers of general circulation are not published in such county, then one (1) publication appearing not less than ten (10) days prior to the date fixed for such hearing in one (1) newspaper of general circulation published in such county shall be sufficient. If no newspaper of general circulation is published in the county, the department of state revenue shall cause notice of such hearing to be given by one (1) publication appearing not less than ten (10) days prior to the date fixed for such hearing in two (2) newspapers of general circulation published in a county adjoining the county where such motor vehicle carrier has its principal office or place of business. If the motor vehicle carrier has no office or place of business in Indiana, then such notice shall be given by one (1) publication appearing not less than ten (10) days prior to the date fixed for the hearing in two (2) newspapers of general circulation published in Marion County.

A-15

(d) In addition to the published notice, the commission shall mail notice of the hearing and notice of the filing of applications or proceedings to persons, firms, limited liability companies, or corporations having competitive interests involved and to the representatives of any city or town affected by the hearing, application, or proceeding. Failure to mail the notices shall not be deemed to be jurisdictional, but may be ground for rehearing.

**IC 8-1-1-9 Suggested orders; filing exceptions**    Sec. 9. In every case where any law to be administered by the commission created by this chapter provides that a party to a proceeding before the commission shall have a time in which to file written exceptions to a suggested order before the same may become the final order of the commission, it shall be the duty of the commission to promptly mail to each party having such right a copy of such suggested order, and the time for filing such exceptions as provided by law shall in each case commence to run on the day of mailing of such copy of such suggested order

**IC 8-1-1-10 Survival, actions, or proceedings pending before former commission**    Sec. 10. Section 7 of this chapter shall not affect actions on or proceedings pending on June 30, 1987, brought by or against the people of the state of Indiana or the public service commission of Indiana or by any other person, firm, or corporation, under the provisions of the statutes establishing or conferring power upon the public service commission of Indiana, but the same may be prosecuted and defended with the same effect as though the name of the commission had not been changed, except the same shall be continued and carried on by the Indiana utility regulatory commission.

**IC 8-1-1-11 Staff of commission**    Sec. 11. The commission is authorized to employ such counsel or attorneys, engineers, administrative law judges, experts, clerks, accountants and other assistants as it may deem necessary, at such rates of compensation as it may determine upon, subject, however, to the approval of the governor.

**IC 8-1-1-14 Annual report**    Sec. 14. (a) The chairman of the commission shall prepare an annual report and file it with the governor and the chairman of the legislative council before October 1 of each year. A report filed under this subsection with the chairman of the legislative council must be in an electronic format under IC 5-14-6. The chairman shall include in the report information for the fiscal year ending June 30 of the year in which the report is due.    (b) The annual report required under subsection (a) must include the following:    (1) A statement of the commission's revenues by source and expenditures by

A-16

purpose.        (2) Statistics relevant to the workload and operations of the
commission.        (3) A description of the commission's goals, legal
responsibilities, and accomplishments.        (4) Comments on the state of the
commission and the various kinds of utilities that it regulates.        (5) Suggestions
for new legislation and the rationale for any proposals.        (6) Any other matters
that the chairman wishes to bring to the attention of the governor and the general
assembly.        (7) Any comments or proposals that any member of the
commission gives to the chairman for inclusion in the annual report.

**IC 8-1-1-15 Implementing rules; duration**        Sec. 15. A rule that the
commission adopts under section 3(g) of this chapter that is necessary to
implement a state or federal statute, rule, or regulation is void sixty-one (61) days
after the expiration of that statute, rule, or regulation, unless the commission makes
a written finding prior to the sixty-first day that it is necessary to retain the rule.

**Federal Energy Regulatory Commission**

§ 35.28

Commission order resolving the disputed issues, the customer may re-evaluate its decision in paragraph (c)(5)(i) of this section to exercise the marketing or brokering option. The customer must notify the utility in writing within 30 days of issuance of the Commission's order resolving the disputed issues whether the customer will market or broker a portion or all of the capacity and energy associated with stranded costs allowed by the Commission.

(iii) If a customer undertakes the brokering option, and the customer's brokering efforts fail to produce a buyer within 60 days of the date of the brokering agreement entered into between the customer and the utility, the customer shall relinquish all rights to broker the released capacity and associated energy and will pay stranded costs as determined by the formula in paragraph (c)(2)(iii) of this section.

(d) *Recovery of retail stranded costs*—1) *General requirement.* A public utility may seek to recover retail stranded costs through rates for retail transmission services only if the state regulatory authority does not have authority under state law to address stranded costs at the time the retail wheeling is required.

(2) *Evidentiary demonstration necessary for retail stranded cost recovery.* A public utility seeking to recover retail stranded costs in accordance with paragraph (d)(1) of this section must demonstrate that:

(i) It incurred costs to provide service to a retail customer that obtains retail wheeling based on a reasonable expectation that the utility would continue to serve the customer; and

(ii) The stranded costs are not more than the customer would have contributed to the utility had the customer remained a retail customer of the utility.

[Order 888–A, 62 FR 12460, Mar. 14, 1997]

**§ 35.27  Authority of State commissions.**

Nothing in this part—

(a) Shall be construed as preempting or affecting any jurisdiction a State commission or other State authority may have under applicable State and Federal law, or

(b) Limits the authority of a State commission in accordance with State and Federal law to establish

(1) Competitive procedures for the acquisition of electric energy, including demand-side management, purchased at wholesale, or

(2) Non-discriminatory fees for the distribution of such electric energy to retail consumers for purposes established in accordance with State law.

[Order 697, 72 FR 40038, July 20, 2007]

**§ 35.28  Non-discriminatory open access transmission tariff.**

(a) *Applicability.* This section applies to any public utility that owns, controls or operates facilities used for the transmission of electric energy in interstate commerce and to any non-public utility that seeks voluntary compliance with jurisdictional transmission tariff reciprocity conditions.

(b) *Definitions*—(1) *Requirements service agreement* means a contract or rate schedule under which a public utility provides any portion of a customer's bundled wholesale power requirements.

(2) *Economy energy coordination agreement* means a contract, or service schedule thereunder, that provides for trading of electric energy on an "if, as and when available" basis, but does not require either the seller or the buyer to engage in a particular transaction.

(3) *Non-economy energy coordination agreement* means any non-requirements service agreement, except an economy energy coordination agreement as defined in paragraph (b)(2) of this section.

(4) *Demand response* means a reduction in the consumption of electric energy by customers from theirexpected consumption in response to an increase in the price of electric energy or to incentive paymentsdesigned to induce lower consumption of electric energy.

(5) *Demand response resource* means a resource capable of providing demand response.

(6) *An operating reserve shortage* means a period when the amount of available supply falls short ofdemand plus the operating reserve requirement.

(7) *Market Monitoring Unit* means the person or entity responsible for carrying out the market monitoringfunctions that the Commission has ordered Commission-approved

independent system operators and regional transmission organizations to perform.

(8) *Market Violation* means a tariff violation, violation of a Commission-approved order, rule or regulation, market manipulation, or inappropriate dispatch that creates substantial concerns regarding unnecessary market inefficiencies.

(c) *Non-discriminatory open access transmission tariffs.* (1) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must have on file with the Commission a tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the open access pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036 (Final Rule on Open Access and Stranded Costs), as revised by the open access pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241 (Final Rule on Open Access Reforms), or such other open access tariff as may be approved by the Commission consistent with Order No. 888, FERC Stats. & Regs ¶31,306 and Order No. 890, FERC Stats. & Regs. ¶31,241.

(i) Subject to the exceptions in paragraphs (c)(1)(ii), (c)(1)(iii), (c)(1)(iv) and (c)(1)(v) of this section, the pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036, as revised by the open access pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, and accompanying rates, must be filed no later than 60 days prior to the date on which a public utility would engage in a sale of electric energy at wholesale in interstate commerce or in the transmission of electric energy in interstate commerce.

(ii) If a public utility owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce as of May 14, 2007, it must file the revisions to the pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Order No. 890, FERC Stats. & Regs ¶31,241.

(iii) If a public utility owns, controls, or operates transmission facilities used for the transmission of electric energy in interstate commerce as of May 14, 2007, such facilities are jointly owned with a non-public utility, and the joint ownership contract prohibits transmission service over the facilities to third parties, the public utility with respect to access over the public utility's share of the jointly owned facilities must file no later than May 14, 2007 the revisions to the pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA.

(iv) Any public utility whose transmission facilities are under the independent control of a Commission-approved ISO or RTO may satisfy its obligation under paragraph (c)(1) of this section, with respect to such facilities, through the open access transmission tariff filed by the ISO or RTO.

(v) If a public utility obtains a waiver of the tariff requirement pursuant to paragraph (d) of this section, it does not need to file the pro forma tariff required by this section.

(vi) Any public utility that seeks a deviation from the pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036, as revised in Order No. 890, FERC Stats. & Regs. ¶31,241, must demonstrate that the deviation is consistent with the principles of Order No. 888, FERC Stats. & Regs ¶31,036 and Order No. 890, FERC Stats. & Regs. ¶31,241.

(vii) Each public utility's open access transmission tariff must include the standards incorporated by reference in part 38 of this chapter.

(2) Subject to the exceptions in paragraphs (c)(2)(i) and (c)(3)(iii) of this section, every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that uses those facilities to engage in wholesale sales and/or purchases of electric energy, or unbundled retail sales of electric energy, must take transmission service for such sales and/or purchases under the open access transmission tariff filed pursuant to this section.

(i) For sales of electric energy pursuant to a requirements service agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission. For sales of electric energy pursuant to a bilateral economy energy coordination agreement executed on or before July 9, 1996, this requirement is effective on December 31, 1996. For sales of electric energy pursuant to a bilateral non-economy energy coordination agreement executed on or before July 9, 1996, this requirement will not apply unless separately ordered by the Commission.

(ii) [Reserved]

(3) Every public utility that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce, and that is a member of a power pool, public utility holding company, or other multi-lateral trading arrangement or agreement that contains transmission rates, terms or conditions, must have on file a joint pool-wide or system-wide open access transmission tariff, which tariff must be the pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036, as revised by the pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, or such other open access tariff as may be approved by the Commission consistent with Order No. 888, FERC Stats. & Regs. ¶31,036 and Order No. 890, FERC Stats. & Regs. ¶31,241.

(i) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed after May 14, 2007, this requirement is effective on the date that transactions begin under the arrangement or agreement.

(ii) For any power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or before May 14, 2007, a public utility member of such power pool, public utility holding company or other multi-lateral arrangement or agreement that owns, controls, or operates facilities used for the transmission of electric energy in interstate commerce must file the revisions to its joint pool-wide or system-

wide contained in Order No. 890, FERC Stats. & Regs. ¶31,241, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Order No. 890, FERC Stats. & Regs ¶31,241.

(iii) A public utility member of a power pool, public utility holding company or other multi-lateral arrangement or agreement that contains transmission rates, terms or conditions and that is executed on or before July 9, 1996 must take transmission service under a joint pool-wide or system-wide open access transmission tariff filed pursuant to this section for wholesale trades among the pool or system members.

(4) Consistent with paragraph (c)(1) of this section, every Commission-approved ISO or RTO must have on file with the Commission a tariff of general applicability for transmission services, including ancillary services, over such facilities. Such tariff must be the pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036, as revised by the pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, or such other open access tariff as may be approved by the Commission consistent with Order No. 888, FERC Stats. & Reg. ¶31,036 and Order No. 890, FERC Stats. & Regs. ¶31,241.

(i) Subject to paragraph (c)(4)(ii) of this section, a Commission-approved ISO or RTO must file the revisions to the pro forma tariff contained in Order No. 890, FERC Stats. & Regs. ¶31,241, pursuant to section 206 of the FPA and accompanying rates pursuant to section 205 of the FPA in accordance with the procedures set forth in Order No. 890, FERC Stats. & Regs ¶31,241.

(ii) If a Commission-approved ISO or RTO can demonstrate that its existing open access tariff is consistent with or superior to the revisions to the pro forma tariff contained in Order No. 888, FERC Stats. & Regs. ¶31,036, as revised by the pro forma tariff in Order No. 890, FERC Stats. & Regs. ¶31,241, or any portions thereof, the Commission-approved ISO or RTO may instead set forth such demonstration in its filing pursuant to section 206 in accordance with the procedures set forth in Order No. 890, FERC Stats. & Regs ¶31,241.

(d) *Waivers.* A public utility subject to the requirements of this section and Order No. 889, FERC Stats. & Regs. ¶31,037 (Final Rule on Open Access Same-Time Information System and Standards of Conduct) may file a request for waiver of all or part of the requirements of this section, or Part 37 (Open Access Same-Time Information System and Standards of Conduct for Public Utilities), for good cause shown. Except as provided in paragraph (f) of this section, an application for waiver must be filed either:

(1) No later than May 14, 2007, or

(2) No later than 60 days prior to the time the public utility would otherwise have to comply with the requirement.

(e) *Non-public utility procedures for tariff reciprocity compliance.* (1) A non-public utility may submit a transmission tariff and a request for declaratory order that its voluntary transmission tariff meets the requirements of Order No. 888, FERC Stats. & Regs. ¶31,036 and Order No. 890, FERC Stats. & Regs. ¶31,241.

(i) Any submittal and request for declaratory order submitted by a non-public utility will be provided an NJ (non-jurisdictional) docket designation.

(ii) If the submittal is found to be an acceptable transmission tariff, an applicant in a Federal Power Act (FPA) section 211 or 211A proceeding against the non-public utility shall have the burden of proof to show why service under the open access tariff is not sufficient and why a section 211 or 211A order should be granted.

(2) A non-public utility may file a request for waiver of all or part of the reciprocity conditions contained in a public utility open access tariff, for good cause shown. An application for waiver may be filed at any time.

(f) *Standard generator interconnection procedures and agreements.* (1) Every public utility that is required to have on file a non-discriminatory open access transmission tariff under this section must amend such tariff by adding the standard interconnection procedures and agreement contained in Order No. 2003, FERC Stats. & Regs. & 31,146 (Final Rule on Generator Interconnection), as amended by the Commission in Order No. 661, FERC Stats.

& Regs. ¶31,186 (Final Rule on Interconnection for Wind Energy), and the standard small generator interconnection procedures and agreement contained in Order No. 2006, FERC Stats. & Regs. ¶31,180 (Final Rule on Small Generator Interconnection), or such other interconnection procedures and agreements as may be approved by the Commission consistent with Order No. 2003, FERC Stats. & Regs. & 31,146 (Final Rule on Generator Interconnection) and Order No. 2006, FERC Stats. & Regs. ¶31,180 (Final Rule on Small Generator Interconnection).

(i) The amendment to implement the Final Rule on Generator Interconnection required by the preceding subsection must be filed no later than January 20, 2004.

(ii) The amendment to implement the Final Rule on Small Generator Interconnection required by the preceding subsection must be filed no later than August 12, 2005.

(iii) The amendment to implement the Final Rule on Interconnection for Wind Energy required by the preceding subsection must be filed no later than December 30, 2005.

(iv) Any public utility that seeks a deviation from the standard interconnection procedures and agreement contained in Order No. 2003, FERC Stats. & Regs. & 31,146 (Final Rule on Generator Interconnection), as amended by the Commission in Order No. 661, FERC Stats. & Regs. ¶31,186 (Final Rule on Interconnection for Wind Energy), or the standard small generator interconnection procedures and agreement contained in Order No. 2006, FERC Stats. & Regs. ¶31,180 (Final Rule on Small Generator Interconnection), must demonstrate that the deviation is consistent with the principles of either Order No. 2003, FERC Stats. & Regs. & 31,146 (Final Rule on Generator Interconnection) or Order No. 2006, FERC Stats. & Regs. ¶31,180 (Final Rule on Small Generator Interconnection).

(2) The non-public utility procedures for tariff reciprocity compliance described in paragraph (e) of this section are applicable to the standard interconnection procedures and agreements.

**Federal Energy Regulatory Commission**                                    **§ 35.28**

(3) A public utility subject to the requirements of this paragraph pertaining to the Final Rule on Generator Interconnection may file a request for waiver of all or part of the requirements of this paragraph, for good cause shown. An application for waiver must be filed either:

(i) No later than January 20, 2004, or

(ii) No later than 60 days prior to the time the public utility would otherwise have to comply with the requirements of this paragraph.

(4) A public utility subject to the requirements of this paragraph pertaining to the Final Rule on Small Generator Interconnection may file a request for waiver of all or part of the requirements of this paragraph, for good cause shown. An application for waiver must be filed either:

(i) No later than August 12, 2005, or

(ii) No later than 60 days prior to the time the public utility would otherwise have to comply with the requirements of this paragraph.

(g) *Tariffs and operations of Commission-approved independent system operators and regionaltransmission organizations.*

(1) *Demand response and pricing.*

(i) *Ancillary services provided by demand response resources.*

(A) Every Commission-approved independent system operator or regional transmission organization thatoperates organized markets based on competitive bidding for energy imbalance, spinning reserves,supplemental reserves, reactive power and voltage control, or regulation and frequency response ancillaryservices (or its functional equivalent in the Commission-approved independent system operator's oregional transmission organization's tariff) must accept bids from demand response resources in thesemarkets for that product on a basis comparable to any other resources, if the demand response resourcemeets the necessary technical requirements under the tariff, and submits a bid under the Commission-approved independent system operator's or regional transmission organization's bidding rules at or belowthe market-clearing price, unless not permitted by the laws or regulations of the relevant electric retailregulatory authority.

(B) Each Commission-approved independent system operator or regional transmission organization mustallow providers of a demand response resource to specify the following in their bids:

(1) A maximum duration in hours that the demand response resource may be dispatched;

(2) A maximum number of times that the demand response resource may be dispatched during a day; and

(3) A maximum amount of electric energy reduction that the demand response resource may be required toprovide either daily or weekly.

(ii) *Removal of deviation charges.* A Commission-approved independent system operator or regionaltransmission organization with a tariff that contains a day-ahead and a real-time market may not assess acharge to a purchaser of electric energy in its day-ahead market for purchasing less power in the real-timemarket during a real-time market period for which the Commission-approved independent system operatoror regional transmission organization declares an operating reserve shortage or makes a generic requestto reduce load to avoid an operating reserve shortage.

(iii) *Aggregation of retail customers.* Each Commission-approved independent system operator and regional transmission organization must accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, and the customers of utilities that distributed 4 million megawatt-hours or less in the previous fiscal year, where the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers. An independent system operator or regional transmission organization must not accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities that distributed more than 4 million megawatt-hours in the previous fiscal year, where the relevant electric retail regulatory authority prohibits such customers' demand

response to be bid into organized markets by an aggregator of retail customers, or the customers of utilities that distributed 4 million megawatthours or less in the previous fiscal year, unless the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an aggregator of retail customers.

(iv) *Price formation during periods of operating reserve shortage.*

(A) Each Commission-approved independent system operator or regional transmission organization mustmodify its market rules to allow the market-clearing price during periods of operating reserve shortage toreach a level that rebalances supply and demand so as to maintain reliability while providing sufficientprovisions for mitigating market power.

(B) A Commission-approved independent system operator or regional transmission organization may phasein this modification of its market rules.

(2) *Long-term power contracting in organized markets.* Each Commission-approved independent system operator or regional transmission organization must provide a portion of its Web site for marketparticipants to post offers to buy or sell power on a long-term basis.

(3) *Market monitoring policies.*

(i) Each Commission-approved independent system operator or regional transmission organization mustmodify its tariff provisions governing its Market Monitoring Unit to reflect the directives provided in OrderNo. 719, including the following:

(A) Each Commission-approved independent system operator or regional transmission organization mustinclude in its tariff a provision to provide its Market Monitoring Unit access to Commission-approvedindependent system operator andregional transmission organization market data, resources and personnel to enable the MarketMonitoring Unit to carry out its functions.

(B) The tariff provision must provide the Market Monitoring Unit complete access to the Commission-approved independent system operator's and regional transmission organization's databases of market information.

(C) The tariff provision must provide that any data created by the Market Monitoring Unit, including, but not limited to, reconfiguring of the Commission-approved independent system operator's and regional transmission organization's data, will be kept within the exclusive control of the Market Monitoring Unit.

(D) The Market Monitoring Unit must report to the Commission-approved independent system operator's or regional transmission organization's board of directors, with its management members removed, or to an independent committee of the Commission-approved independent system operator's or regional transmission organization's board of directors. A Commission-approved independent system operator or regional transmission organization that has both an internal Market Monitoring Unit and an external Market Monitoring Unit may permit the internal Market Monitoring Unit to report to management and the external Market Monitoring Unit to report to the Commission-approved independent system operator's or regional transmission organization's board of directors with its management members removed, or to an independent committee of the Commission-approved independent system operator or regional transmission organization board of directors. If the internal market monitor is responsible for carrying out any or all of the core Market Monitoring Unit functions identified in paragraph (g)(3)(ii) of this section, the internal market monitor must report to the independent system operator's or regional transmission organization's board of directors.

(E) A Commission-approved independent system operator or regional transmission organization may not alter the reports generated by the Market Monitoring Unit, or dictate the conclusions reached by the Market Monitoring Unit.

(F) Each Commission-approved independent system operator or regional transmission organization must consolidate the core Market Monitoring Unit provisions into one section of its tariff. Each independent system operator or regional transmission organization must include a mission statement

in the introduction to the Market Monitoring Unit provisions that identifies the Market Monitoring Unit's goals, including the protection of consumers and market participants by the identification and reporting of market design flaws and market power abuses.

(ii) *Core Functions of Market Monitoring Unit.* The Market Monitoring Unit must perform the following core functions:

(A) Evaluate existing and proposed market rules, tariff provisions and market design elements and recommend proposed rule and tariff changes to the Commission-approved independent system operator or regional transmission organization, to the Commission's Office of Energy Market Regulation staff and to other interested entities such as state commissions and market participants, provided that:

(*1*) The Market Monitoring Unit is not to effectuate its proposed market design itself, and

(*2*) The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to Commission staff in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) Review and report on the performance of the wholesale markets to the Commission-approved independent system operator or regional transmission organization, the Commission, and other interested entities such as state commissions and market participants, on at least a quarterly basis and submit a more comprehensive annual state of the market report. The Market Monitoring Unit may issue additional reports as necessary.

(C) Identify and notify the Commission's Office of Enforcement staff of instances in which a market participant's or the Commission-approved independent system operator's or regional transmission organization's behavior may require investigation, including, but not limited to, suspected Market Violations.

(iii) *Tariff administration and mitigation*

(A) A Commission-approved independent system operator or regional transmission organization may not permit its Market Monitoring Unit, whether internal or external, to participate in the administration of the Commission-approved independent system operator's or regional transmission organization's tariff or, except as provided in paragraph (g)(3)(iii)(D) of this section, to conduct prospective mitigation.

(B) A Commission-approved independent system operator or regional transmission organization may permit its Market Monitoring Unit to provide the inputs required for the Commission-approved independent system operator or regional transmission organization to conduct prospective mitigation, including, but not limited to, reference levels, identification of system constraints, and cost calculations.

(C) A Commission-approved independent system operator or regional transmission organization may allow its Market Monitoring Unit to conduct retrospective mitigation.

(D) A Commission-approved independent system operator or regional transmission organization with a hybrid Market Monitoring Unit structure may permit its internal market monitor to conduct prospective and/or retrospective mitigation, in which case it must assign to its external market monitor the responsibility and the tools to monitor the quality and appropriateness of the mitigation.

(E) Each Commission-approved independent system operator or regional transmission organization must identify in its tariff the functions the Market Monitoring Unit will perform and the functions the Commission-approved independent system operator or regional transmission organization will perform.

(iv) *Protocols on Market Monitoring Unit referrals to the Commission of suspected violations.*

(A) A Market Monitoring Unit is to make a non-public referral to the Commission in all instances where the Market Monitoring Unit has reason to believe that a Market Violation has occurred. While the Market Monitoring Unit need not be able to prove that a Market Violation has occurred, the

Market Monitoring Unit is to provide sufficient credible information to warrant further investigation by the Commission. Once the Market Monitoring Unit has obtained sufficient credible information to warrant referral to the Commission, the Market Monitoring Unit is to immediately refer the matter to the Commission and desist from independent action related to the alleged Market Violation. This does not preclude the Market Monitoring Unit from continuing to monitor for any repeated instances of the activity by the same or other entities, which would constitute new Market Violations. The Market Monitoring Unit is to respond to requests from the Commission for any additional information in connection with the alleged Market Violation it has referred.

(B) All referrals to the Commission of alleged Market Violations are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral is to be addressed to the Commission's Director of the Office of Enforcement, with a copy also directed to both the Director of the Office of Energy Market Regulation and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

(1) The name[s] of and, if possible, the contact information for, the entity[ies] that allegedly took the action[s] that constituted the alleged Market Violation[s];

(2) The date[s] or time period during which the alleged Market Violation[s] occurred and whether the alleged wrongful conduct is ongoing;

(3) The specific rule or regulation, and/or tariff provision, that was allegedly violated, or the nature of any inappropriate dispatch that may have occurred;

(4) The specific act[s] or conduct that allegedly constituted the Market Violation;

(5) The consequences to the market resulting from the acts or conduct, including, if known, an estimate of economic impact on the market;

(6) If the Market Monitoring Unit believes that the act[s] or conduct constituted a violation of the anti-manipulation rule of Part 1c, a description of the alleged manipulative effect on market prices, market conditions, or market rules;

(7) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any information that the Market Monitoring Unit learns of that may be related to the referral, but the Market Monitoring Unit is not to undertake any investigative steps regarding the referral except at the express direction of the Commission or Commission Staff.

(v) *Protocols on Market Monitoring Unit Referrals to the Commission of Perceived Market Design Flaws and Recommended Tariff Changes.*

(A) A Market Monitoring Unit is to make a referral to the Commission in all instances where the Market Monitoring Unit has reason to believe market design flaws exist that it believes could effectively be remedied by rule or tariff changes. The Market Monitoring Unit must limit distribution of its identifications and recommendations to the independent system operator or regional transmission organization and to the Commission in the event it believes broader dissemination could lead to exploitation, with an explanation of why further dissemination should be avoided at that time.

(B) All referrals to the Commission relating to perceived market design flaws and recommended tariff changes are to be in writing, whether transmitted electronically, by fax, mail, or courier. The Market Monitoring Unit may alert the Commission orally in advance of the written referral.

(C) The referral should be addressed to the Commission's Director of the Office of Energy Market Regulation, with copies directed to both the Director of the Office of Enforcement and the General Counsel.

(D) The referral is to include, but need not be limited to, the following information.

**Federal Energy Regulatory Commission**

**§ 35.28**

(*1*) A detailed narrative describing the perceived market design flaw[s];

(*2*) The consequences of the perceived market design flaw[s], including, if known, an estimate of economic impact on the market;

(*3*) The rule or tariff change(s) that the Market Monitoring Unit believes could remedy the perceived market design flaw;

(*4*) Any other information the Market Monitoring Unit believes is relevant and may be helpful to the Commission.

(E) Following a referral to the Commission, the Market Monitoring Unit is to continue to notify and inform the Commission of any additional information regarding the perceived market design flaw, its effects on the market, any additional or modified observations concerning the rule or tariff changes that could remedy the perceived design flaw, any recommendations made by the Market Monitoring Unit to the regional transmission organization or independent system operator, stakeholders, market participants or state commissions regarding the perceived design flaw, and any actions taken by the regional transmission organization or independent system operator regarding the perceived design flaw.

(vi) *Market Monitoring Unit ethics standards.* Each Commission-approved independent system operator or regional transmission organization must include in its tariff ethical standards for its Market Monitoring Unit and the employees of its Market Monitoring Unit. At a minimum, the ethics standards must include the following requirements:

(A) The Market Monitoring Unit and its employees must have no material affiliation with any market participant or affiliate.

(B) The Market Monitoring Unit and its employees must not serve as an officer, employee, or partner of a market participant.

(C) The Market Monitoring Unit and its employees must have no material financial interest in any market participant or affiliate with potential exceptions for mutual funds and non-directed investments.

(D) The Market Monitoring Unit and its employees must not engage in any market transactions other than the performance of their duties under the tariff.

(E) The Market Monitoring Unit and its employees must not be compensated, other than by the Commission-approved independent system operator or regional transmission organization that retains or employs it, for any expert witness testimony or other commercial services, either to the Commission-approved independent system operator or regional transmission organization or to any other party, in connection with any legal or regulatory proceeding or commercial transaction relating to the Commission-approved independent system operator or regional transmission organization or to the Commission-approved independent system operator's or regional transmission organization's markets.

(F) The Market Monitoring Unit and its employees may not accept anything of value from a market participant in excess of a *de minimis* amount.

(G) The Market Monitoring Unit and its employees must advise a supervisor in the event they seek employment with a market participant, and must disqualify themselves from participating in any matter that would have an effect on the financial interest of the market participant.

(4) *Offer and bid data.* (i) Unless a Commission-approved independent system operator or regional transmission organization obtains Commission approval for a different period, each Commission-approved independent system operator and regional transmission organization must release its offer and bid data within three months.

(ii) A Commission-approved independent system operator or regional transmission organization must mask the identity of market participants when releasing offer and bid data. The Commission-approved independent system operators and regional transmission organization may propose a time period for eventual unmasking.

(5) *Responsiveness of Commission-approved independent system operators and regional transmission organizations.* Each Commission-approved independent system operator or regional transmission

319

organization must adopt business practices and procedures that achieve Commission-approved independent system operator and regional transmission organization board of directors' responsiveness to customers and other stakeholders and satisfy the following criteria:

(i) *Inclusiveness.* The business practices and procedures must ensure that any customer or other stakeholder affected by the operation of the Commission-approved independent system operator or regional transmission organization, or its representative, is permitted to communicate the customer's or other stakeholder's views to the independent system operator's or regional transmission organization's board of directors;

(ii) *Fairness in balancing diverse interests.* The business practices and procedures must ensure that the interests of customers or other stakeholders are equitably considered, and that deliberation and consideration of Commission-approved independent system operator's and regional transmission organization's issues are not dominated by any single stakeholder category;

(iii) *Representation of minority positions.* The business practices and procedures must ensure that, in instances where stakeholders are not in total agreement on a particular issue, minority positions are communicated to the Commission-approved independent system operator's and regional transmission organization's board of directors at the same time as majority positions; and

(iv) *Ongoing responsiveness.* The business practices and procedures must provide for stakeholder input into the Commission-approved independent system operator's or regional transmission organization's decisions as well as mechanisms to provide feedback to stakeholders to ensure that information exchange and communication continue over time.

(6) *Compliance filings.* All Commission-approved independent system operators and regional transmission organizations must make a compliance filing with the Commission as described in Order No. 719 under the following schedule:

(i) The compliance filing addressing the accepting of bids from demand response resources in markets for ancillary services on a basis comparable to other resources, removal of deviation charges, aggregation of retail customers, shortage pricing during periods of operating reserve shortage, long-term power contracting in organized markets, Market Monitoring Units, Commission-approved independent system operators' and regional transmission organizations' board of directors' responsiveness, and reporting on the study of the need for further reforms to remove barriers to comparable treatment of demand response resources must be submitted on or before April 28, 2009.

(ii) A public utility that is approved as a regional transmission organization under § 35.34, or that is not approved but begins to operate regional markets for electric energy or ancillary services after December 29, 2008, must comply with Order No. 719 and the provisions of paragraphs (g)(1) through (g)(5) of this section before beginning operations.

[Order 888, 61 FR 21693, May 10, 1996, as amended by Order 2003, 68 FR 49929, Aug. 19, 2003; Order 2006, 70 FR 34240, June 13, 2005; Order 661, 70 FR 75014, Dec. 19, 2005; Order 676, 71 FR 26212, May 4, 2006; Order 890, 72 FR 12492, Mar. 15, 2007; 73 FR 64167, Oct. 28, 2008; Order 719-A, 74 FR 37801, July 29, 2009]

§ 35.29  Treatment of special assessments levied under the Atomic Energy Act of 1954, as amended by Title XI of the Energy Policy Act of 1992.

The costs that public utilities incur relating to special assessments under the Atomic Energy Act of 1954, as amended by the Energy Policy Act of 1992, are costs that may be reflected in jurisdictional rates. Public utilities seeking to recover the costs incurred relating to special assessments shall comply with the following procedures.

(a) *Fuel adjustment clauses.* In computing the Account 518 cost of nuclear fuel pursuant to § 35.14(a)(6), utilities seeking to recover the costs of special assessments through their fuel adjustment clauses shall:

(1) Deduct any expenses associated with special assessments included in Account 518;