**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

# In the United States Court of Appeals for the District of Columbia Circuit

No. 10-1313

———————

INDIANA UTILITY REGULATORY COMMISSION,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

Michael A. Bardee
General Counsel

Robert H. Solomon
Solicitor

Samuel Soopper
Attorney

For Respondent Federal
Energy Regulatory
Commission
Washington, D.C. 20426

March 9, 2011

# CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.  **Parties and Amici**

All parties appearing below and in this Court are listed in the

petitioner's and the intervenor's brief.

### B.  **Rulings Under Review**

The rulings under review appear in the following orders issued by the

Federal Energy Regulatory Commission:

1.  Order Conditionally Accepting Proposed Tariff Revisions,   *PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,238 (2009) (Tarriff Order), JA ___; and

2.  Order On Rehearing, Clarification, and Compliance, *PJM Interconnection, L.L.C.*, 131 FERC ¶ 61,069 (2010) (Rehearing Order), JA ___ .

### C.  **Related Cases**

This case was originally filed in the United States Court of Appeals

for the Seventh Circuit, No. 10-2512, and transferred to this Court.

Undersigned counsel is not aware of any other related cases.


*/s/ Samuel Soopper*
Samuel Soopper
Attorney


March 9, 2011

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF THE ISSUE…………………………………………..1

STATUTORY AND REGULATORY PROVISIONS……………………...1

INTRODUCTION AND COUNTER-STATEMENT OF
JURISDICTION…………………………………………………………..2

STATEMENT OF FACTS………………………………………………..3

I.    Statutory and Regulatory Background…………………………..3

II.   The Proceedings Before The Commission…………………………6

      A.    The Demand Response Rulemaking Proceeding………………6

            1.    Order No. 719…………………………………………...6

            2.    Order No. 719-A…………………………………………...8

      B.    PJM's Compliance Proceeding………………………………...9

            1.    PJM's First Compliance Filing…………………………9

            2.    The Tariff Order………………………………………11

            3.    Subsequent Filings By The Parties……………………13

                  a.    Indiana's Rehearing Request……………………13

                  b.    PJM's Revised Compliance Filing......................14

            4.    The Rehearing Order…………………………………..14

SUMMARY OF ARGUMENT………………………………………16

ARGUMENT……………………………………………………………19

# TABLE OF CONTENTS

**PAGE**

I.  THE COURT LACKS JURISDICTION TO REVIEW
    THE ISSUES INDIANA FAILED TO RAISE ON
    REHEARING BEFORE THE COMMISSION……………………..19

    A.  Indiana Did Not Seek Rehearing Of Its Claim
        That The Commission Approved Tariff Revisions
        Employing A Presumption Contrary To Its
        Regulations………………………………………………...20

    B.  Indiana Did Not Seek Rehearing Of Its Claim
        That The Commission's Approval Of PJM's
        Notification Procedure Exceeded The Agency's
        Jurisdiction……………………………………………………23

II. THE COMMISSION REASONABLY APPROVED PJM'S
    TARIFF PROCEDURE REQUIRING RETAIL UTILITIES
    TO NOTIFY STATE COMMISSIONS OF DEMAND RESPONSE
    REGISTRATION……………………………………………………26

    A.  Standard Of Review…………………………………………..26

    B.  The Commission's Decision Was A Reasonable
        Exercise Of Its Regulatory Discretion………………………..27

CONCLUSION……………………………………………………………31

# TABLE OF AUTHORITIES

**COURT CASES:**                                                              **PAGE**

*Alabama Mun. Distribs. Group v. FERC,*
    300 F.3d 877 (D.C. Cir. 2002)……………………………………………25

*Alcoa Inc. v. FERC,*
    564 F.3d 1342 (D.C. Cir. 2009)……………………………………………..26

*\*Allegheny Power v. FERC,*
    437 F.3d 1215 (D.C. Cir. 2006)……………………………………………..23

*American Public Power Ass' v. FERC,*
    D.C. Cir. No. 09-1243………………………………………………………...9

*Am. Gas Ass'n v. FERC,*
    593 F.3d 14 (D.C. Cir. 2010)………………………………………………..26

*Apache Corp v. FERC,*
    627 F.3d 1220 (D.C. Cir. 2010)……………………………………………..22

*Blumenthal v. FERC,*
    552 F.3d 875 (D.C. Cir. 2009)……………………………………………29

*California Dept. of Water Resources v. FERC,*
    306 F.3d 1121 (D.C. Cir. 2002)…………………………………………25, 26

*City of Cleveland v. FERC,*
    773 F.2d 1368 (D.C. Cir. 1985)……………………………………………..27

*City of Orrville v. FERC,*
    147 F.3d 979 (D.C. Cir. 1998)……………………………………………22

_____

**\*Cases chiefly relied upon are marked with an asterisk.**

iii

# TABLE OF AUTHORITIES

**COURT CASES:**                                        **PAGE**

*Connecticut Dept. of Public Utility Control v. FERC*,
    569 F.3d 477 (D.C. Cir. 2009)………………………………………24

*Consolidated Edison Co. of New York v. FERC*,
    315 F.3d 316 (D.C. Cir. 2003)………………………………………28

*Constellation Energy Commodities Group v. FERC*,
    457 F.3d 14 (D.C. Cir. 2003)………………………………………..24

*Consumers Energy Co. v. FERC*,
    428 F.3d 1065 (D.C. Cir. 2005)……………………………………..27

*Duncan's Point Lot Owners Ass'n, Inc. v. FERC*,
    522 F.3d 371 (D.C. Cir. 2008)………………………………………19

*Gulf States Util. Co. v. FPC*,
    411 U.S. 747 (1973)…………………………………………………..4

*Illinois Bell Tel. Co. v. FCC*,
    911 F.2d 776 (D.C. Cir. 1990)…………………………………........25

*\*Intermountain Mun. Gas Agency v. FERC*,
    326 F.3d 1281 (D.C. Cir. 2003)……………………………………..24

*Maryland Pub. Serv. Comm'n v. FERC*,
    2011 U.S. App. LEXIS 3172 (D.C. Cir. Feb. 8, 2011)………………4

*Midwest ISO Transmission Owners v. FERC*,
    373 F.3d 1361 (D.C. Cir. 2004)………………………………………5

*Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1*,
    128 S. Ct. 2733 (2008)………………………………………………27

# TABLE OF AUTHORITIES

**COURT CASES:**                                              **PAGE**

*NAACP v. FPC*,
        425 U.S. 662 (1976)……………………………………………………..4

*New York v. FERC*,
        535 U.S. 1 (2002)……………………………………………………4, 29

*Office of Consumers' Counsel v. FERC*,
        914 F.2d 290 (D.C. Cir. 1990)………………………………………23

*Old Dominion Elec. Coop. v. FERC*,
        518 F.3d 43 (D.C. Cir. 2008)………………………………………..27

*Public Utils. Comm'n of California v. FERC*,
        367 F.3d 925 (D.C. Cir. 2004)………………………………………..4

*Sacramento Municipal Utility District v. FERC*,
        616 F.3d 520 (D.C. Cir. 2010)…………………………………….....26

*\*Save Our Sebasticook v. FERC*,
        431 F.3d 379 (D.C. Cir. 2005)………………………………………22

*Sithe/Independence Power Partners v. FERC*,
        165 F.3d 944 (D.C. Cir. 1999)………………………………………26

*Wisconsin Power & Light v. FERC*,
        363 F.3d 453 (D.C. Cir. 2004)………………………………………24

**ADMINISTRATIVE CASES:**

*PJM Interconnection, L.L.C.*,
        128 FERC ¶ 61,238 (2009)...................2, 11, 12, 13, 16, 20, 21, 22, 28

*PJM Interconnection, L.L.C.*,
        131 FERC ¶ 61,069 (2010)..............................2, 14, 15, 16, 20, 21, 22

# TABLE OF AUTHORITIES

**ADMINISTRATIVE CASES:**                                    **PAGE**

*Regional Transmission Organizations*, Order No. 2000, FERC
       Stats. & Regs., Regs. Preambles ¶ 31,089 (1999), *order
       on reh'g*, Order No. 2000-A, FERC Stats. & Regs., Regs.
       Preambles ¶ 31,092 (2000), *appeal dismissed sub nom.
       Public Utility District No. 1 v. FERC*, 272 F.3d 607
       (D.C. Cir. 2001)……………………………………………4, 5

*Wholesale Competition in Regions with Organized Electric Markets*,
       Order No. 719, 73 Fed. Reg. 61,400 (Oct. 28, 2008), FERC
       Stats. & Regs. ¶ 31,281 (2008), JA ___; order on reh'g,
       Order No. 719-A, 74 Fed. Reg. 37,776 (Jul. 29, 2009), FERC
       Stats. & Regs. ¶ 31,292 (2009), JA ___; order on reh'g,
       Order No. 719-B, 129 FERC ¶ 61,252 (2009)……………….........6-29

**STATUTES:**

Energy Policy Act

       Pub. L. No. 109-58, 119 Stat. 594 (2005)…………………………….5

Federal Power Act

       Section 201(b), 16 U.S.C. 824(b)..........................................................3

       Section 201(b)(1), 16 U.S.C. § 824(b)(1)..........................................23

       Section 205(a)-(b), 16 U.S.C. §§ 824d(a)-(b)………………………..4

       Section 206, 16 U.S.C. § 824e(a)……………………………………..4

       Section 313(b), 16 U.S.C. § 825*l*(b).......................................3, 22, 23

## TABLE OF AUTHORITIES

**REGULATIONS:**                                                    **PAGE**

18 C.F.R. § 35.28(b)(4)……………………………………………….6

18 C.F.R. § 35.28(g)(1)(iii)………………………………………...9

# GLOSSARY

| | |
|---|---|
| American Electric Power | American Electric Power Service Corporation, intervenor on appeal |
| FPA | Federal Power Act |
| Indiana | Indiana Utility Regulatory Commission, petitioner on appeal |
| MWh | Megawatt hours |
| Order No. 719 | *Wholesale Competition in Regions with Organized Electric Markets*, Final Rule, 73 Fed. Reg. 61,400 (Oct. 28, 2008), FERC Stats. & Regs. ¶ 31,281 (2008), JA ___. |
| Order No. 710-A | *Wholesale Competition in Regions with Organized Electric Markets*, Order on Rehearing, 74 Fed. Reg. 37,776 (Jul. 29, 2009), FERC Stats. & Regs. ¶ 31,292 (2009), JA ___. |
| PJM | PJM Interconnection, L.L.C., intervenor on appeal |
| Rehearing Order | Order On Rehearing, Clarification, and Compliance, *PJM Interconnection, L.L.C.*, 131 FERC ¶ 61,069 (2010), JA ___. |
| Tariff Order | Order Conditionally Accepting Proposed Tariff Revisions, *PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,238 (2009), JA ___. |

# In The United States Court Of Appeals
# For The District Of Columbia Circuit

———————

**No. 10-1313**

———————

## INDIANA UTILITY REGULATORY COMMISSION, PETITIONER,

**v.**

## FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT.

———————

## ON PETITION FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

### STATEMENT OF THE ISSUE

Whether the Federal Energy Regulatory Commission (Commission or FERC) properly respected the role of state retail regulators in approving, as modified, terms of a tariff provision filed by PJM Interconnection, L.L.C. (PJM), governing the procedures under which certain retail consumers may participate in PJM's demand response program.

### STATUTORY AND REGULATORY PROVISIONS

The pertinent statutes and regulations are contained in Addendum A to this

brief.

## INTRODUCTION AND COUNTER-STATEMENT OF JURISDICTION

Petitioner Indiana Utility Regulatory Commission (Indiana) seeks review of two Commission orders that accepted, as modified, PJM's tariff revisions designed to comply with FERC regulations governing certain aspects of the operation of organized wholesale energy markets.  Order Conditionally Accepting Proposed Tariff Revisions, *PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,238 (2009), Joint Appendix (JA) ___ (Tariff Order), and Order On Rehearing, Clarification, and Compliance, *PJM Interconnection, L.L.C.*, 131 FERC ¶ 61,069 (2010), JA ___ (Rehearing Order).

PJM is the regional operator and coordinator of wholesale energy markets in various mid-Atlantic and mid-Western states.  The FERC directed modifications to the PJM tariff to ensure that state regulatory authorities, like Indiana, are able to determine the eligibility of retail consumers to participate in PJM's demand response program.  (Demand response is, generally, the ability of a utility consumer to alter energy consumption in response to a price change.)  Dissatisfied with FERC's action, Indiana argues now, grandly, that the FERC somehow eradicated Indiana's role in the process. *See*, *e.g.*, Pet. Br. 29 (arguing, in conclusion, that FERC's approval of PJM's tariff revision "allow[s] retail customer participation that has been prohibited by the Indiana Commission").

2

The Commission did no such thing in the orders on review. And Indiana never presented such an objection to the FERC. In particular, Indiana did not raise in its petition for rehearing various arguments, now presented on review to this Court, that PJM's tariff, as conditionally accepted by the Commission, violates FERC regulations and policies. *See* Pet. Br. 19-22 (FERC adopted a presumption of retail customer eligibility), 23-24, 26-28 (FERC's action departed from its regulations), and 28-29 (FERC exceeded its Federal Power Act jurisdiction in allowing notification by retail utilities of retail customer participation in PJM's demand response program). As explained more fully in Part I of the Argument, because Indiana failed to preserve these issues for judicial review, this Court lacks jurisdiction to consider them. *See* 16 U.S.C. § 825*l*(b) (limiting the Court's jurisdiction to only those objections "urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do").

## STATEMENT OF FACTS

## I.     Statutory and Regulatory Background

Section 201(b) of the Federal Power Act confers upon the Commission jurisdiction over all rates, terms and conditions of electric transmission service and sales at wholesale by public utilities in interstate commerce. 16 U.S.C. § 824(b). The Commission also has jurisdiction over the facilities for such wholesale sales and transmission services, but not over generating or local distribution facilities.

3

*Id.* Section 205 of the Act prohibits unjust and unreasonable rates and undue

discrimination "with respect to any transmission or sale subject to the jurisdiction

of the Commission," 16 U.S.C. §§ 824d(a)-(b), while section 206 gives the agency

the power to correct any such unlawful practices.  16 U.S.C. § 824e(a).

The Federal Power Act charges the Commission to employ its authority "to

provide effective federal regulation of the expanding business of transmitting and

selling electric power in interstate commerce."  *New York v. FERC*, 535 U.S. 1, 6

(2002) (quoting *Gulf States Util. Co. v. FPC*, 411 U.S. 747, 758 (1973)).  A

primary purpose of the Act is "to encourage the orderly development" of electricity

supplies "at reasonable prices."  *Public Utils. Comm'n of California v. FERC*, 367

F.3d 925, 929 (D.C. Cir. 2004) (quoting *NAACP v. FPC*, 425 U.S. 662, 670

(1976)).

This case arises from tariff filings by PJM, a Regional Transmission

Organization that operates in 13 states and the District of Columbia.  *See, e.g.*,

*Maryland Pub. Serv. Comm'n v. FERC*, 2011 U.S. App. LEXIS 3172 (D.C. Cir.

Feb. 8, 2011) (explaining PJM operations).  This Court is well aware of the role the

Commission established in Order No. 2000[1] for Regional Transmission

Organizations such as PJM in the development of organized regional wholesale

---

[1]*Regional Transmission Organizations*, Order No. 2000, FERC Stats. &
Regs., Regs. Preambles ¶ 31,089 (1999), *order on reh'g*, Order No. 2000-A, FERC
Stats. & Regs., Regs. Preambles ¶ 31,092 (2000), *appeal dismissed sub nom.*
*Public Utility District No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

energy markets.  *See, e.g., Midwest ISO Transmission Owners v. FERC*, 373 F.3d

1361, 1364 (D.C. Cir. 2004).  In the Commission's view, Regional Transmission

Organizations support "better regional coordination in areas such as maintenance

of transmission and generation systems and transmission planning and operation . .

. necessary to address regional reliability concerns and to foster competition" over

wider geographic areas.  *Midwest ISO Transmission Owners*, 373 F.3d at 1364

(quoting Order No. 2000 at 30,999) (internal quotation marks omitted); *see also*

*Public Utility District No. 1*, 272 F.3d at 611.

This case also implicates the Commission's decision that Regional

Transmission Organizations should allow demand response programs to play an

important role in their organized markets.  In the Energy Policy Act of 2005, Pub.

L. No. 109-58, 119 Stat. 594, 965 (2005), Congress, among many other things,

established as "the policy of the United States that time-based pricing and other

forms of demand response, whereby electricity customers are provided with

electricity price signals and the ability to benefit by responding to them, shall be

encouraged."  16 U.S.C. § 2642(f).

Thus, in amending its regulations to improve the operation of organized

wholesale electric power markets throughout the country, the Commission

included a provision that Regional Transmission Organizations provide procedures

for accepting bids from demand response resources in their markets for various

energy services.  *Wholesale Competition in Regions with Organized Electric Markets*, Order No. 719, 73 Fed. Reg. 64,100 (Oct. 28, 2008), FERC Stats. & Regs. ¶ 31,281 (2008), JA ___; *order on reh'g*, Order No. 719-A, 74 Fed. Reg. 37,776 (Jul. 29, 2009), FERC Stats. & Regs. ¶ 31,292 (2009), JA ___; *order on reh'g*, Order No. 719-B, 129 FERC ¶ 61,252 (2009).  Order No. 719 also amended the Commission's regulations to define demand response as "a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy."  18 C.F.R. § 35.28(b)(4).

The contested orders in this case arise from PJM's filings to comply with the regulatory mandates of Order Nos. 719 and 719-A.

## II.     The Proceedings Before The Commission

### A.  The Demand Response Rulemaking Proceeding

### 1.  Order No. 719

As relevant here, Order No. 719 contemplated a role in demand response programs in organized energy markets for aggregators of retail customers, *i.e.*, entities that aggregate demand response bids, mostly from retail loads.  Order No. 719 P 3 n.3, JA ___.  Allowing an aggregator "to act as an intermediary for many small retail loads that cannot individually participate in the organized market

6

would reduce a barrier to demand response," the Commission predicted, and thus help increase competition, reduce prices to consumers, and enhance reliability.  *Id.* P 154, JA ___.

For this reason, Order No. 719 called for Regional Transmission Organizations to "amend their market rules as necessary to permit an [aggregator of retail customers] to bid demand response on behalf of retail customers directly into the [Regional Transmission Organization's] . . . organized market, unless the laws or regulations of the relevant electric retail regulatory authority do not permit a retail customers to participate."  Order No. 719 P 154, JA ___.  The latter qualification reflected the Commission's deference to concerns expressed by state retail regulatory authorities that permitting this role by the aggregator of retail customers might place an "undue burden" on them.  *Id.* P 155, JA ___.  In this regard, the Commission emphasized that it did not intend to so burden state regulators, interfere with the operation of successful state and local demand response programs, or "raise new concerns regarding federal and state jurisdiction."  *Id.*

Order No. 719, therefore, concluded that the new regulations "will not require a retail electric regulatory authority to make any showing and take any action in compliance with this rule."  Order No. 719 P 155, JA ___.  Rather, the Commission explained, it was requiring "[a Regional Transmission Organization]

7

. . . to accept a bid from an [aggregator of retail customers], unless the laws or regulations of the relevant electric retail regulatory authority do not permit the customers aggregated in the bid to participate." *Id.*

Order No. 719 went on to require each Regional Transmission Organization to submit a filing within six months of its issuance, demonstrating that its tariff was in compliance with the final rule, including the portion related to aggregators of retail customers.  Order No. 719, P 163, JA ___.

### 2.  Order No. 719-A

A number of parties requested rehearing of Order No. 719.[2]  On July 16, 2009, the Commission issued Order No. 719-A, JA ___, addressing the issues raised by these requests, including some related to aggregators of retail customers. In so doing, the Commission generally affirmed its Federal Power Act jurisdiction to make rules requiring Regional Transmission Organizations to accept demand response bids.  Order No. 719-A P 42, JA ___.

In Order 719-A, the Commission decided that the regulations should differentiate between large utilities (aggregation allowed unless the state prohibits) and small utilities (aggregation only if the state permits).  Thus, Regional Transmission Organizations would not be allowed to accept bids from aggregators

---

[2]Indiana participated in the Order No. 719 rulemaking proceeding as a member of the Organization of PJM States, Inc., which was not among the parties requesting rehearing.

of retail customers that "aggregate the demand response of . . . customers of utilities that distributed more than 4 million MWh in the previous fiscal year, where the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an [aggregator of retail customers]." Order No. 719-A P 51, JA ___.  For customers of utilities that distributed 4 million MWh or less in the previous fiscal year, Regional Transmission Organizations would not be allowed to accept bids from aggregators of retail customers "unless the relevant electric retail regulatory authority permits such customers' demand response to be bid into organized markets by an [aggregator of retail customers]."  *Id.  See also* 18 C.F.R. § 35.28(g)(1)(iii) (demand response aggregation of retail customers).[3]

### B.  PJM's Compliance Proceeding

### 1.  PJM's First Compliance Filing

On February 9, 2009, PJM submitted to the Commission proposed revisions to its Operating Agreement (the Amended and Restated Operating Agreement of PJM Interconnection, L.L.C.) and its Open Access Transmission Tariff, in order to comply with the dictates of Order No. 719.  Record (R) 1, JA ___ (collectively referred to in this brief as PJM's tariff).  At this point, PJM sought an effective date

---

[3]On December 10, 2009, this Court dismissed, following a show cause direction, the only petition for review – *American Public Power Ass'n v. FERC*, D.C. Cir. No. 09-1243 – of the Commission's Order No. 719 rulemaking orders.

of April 13, 2009, for these tariff revisions, as "[t]imely adoption of these Operating Agreement revisions will ensure a more efficient registration process for customers seeking to provide [demand response] services while recognizing the state's role should the state decide to bar participation of its retail customers in such programs." *Id.* at 1, JA ___.

PJM observed that while its existing tariff provisions allowed for retail utilities to register for its demand response programs, they lacked clarity on the ability of state regulators to assure that no utilities participated in these programs contrary to state law. PJM February 2009 Filing at 2, JA ___. To solve this problem and comply with Order No. 719, PJM proposed to revise its tariff to require retail utilities participating in its demand response programs to "ensure that there are no laws or regulations of the Relevant Electric Retail Regulatory Authority expressly prohibiting their participation." *Id.* at 4, JA ___. The revisions also addressed what evidence a retail utility must submit to PJM to demonstrate that no state law or regulation prohibits such participation. *Id.* at 5, JA ___.

Indiana was among the parties filing protests to various aspects of PJM's proposal. *See* R 15, JA ___; R 32, JA ___. On April 10, 2009, the Commission issued a letter directing PJM to provide additional information concerning, among other matters, the mechanics of its proposed demand response registration

10

proposal. R 42, JA ___. On April 28, 2009, PJM submitted its response to the

deficiency letter, R 43, JA ___, to which Indiana, among others, filed further

protests. R 49, JA ___; R 58, JA ___.

### 2. The Tariff Order

On September 14, 2009, the Commission issued the Tariff Order, the first

order on appeal here, conditionally accepting PJM's proposed tariff revisions

intended to comply with Order No. 719. JA ___. The Tariff Order addressed

several issues raised by state retail regulators about PJM's proposed changes to its

demand response programs.

As the Commission described it, PJM proposed a so-called "opt-out

approach." Under this approach, "if the relevant electric retail regulatory authority

has laws or regulations prohibiting" retail customers or classes of such customers

"from participating in PJM's Demand Response Programs, upon receipt of

evidence of such laws or regulations, no such customers in that jurisdiction would

be allowed to participate." Tariff Order P 13, JA ___.

However, the Commission recognized that Order No. 719-A (which had

issued after PJM's tariff filing) had changed the regulatory landscape, by clarifying

"that relevant retail regulatory authorities retain substantial flexibility in

establishing requirements for eligibility of retail customers to provide demand

response." Tariff Order P 22, JA ___. In the Commission's view, PJM's proposal

11

ran afoul of that clarification because it would, "in practice, excessively limit a retail regulatory authority's ability to condition the eligibility of its retail customers to participate in PJM's Demand Response Programs." *Id.* Therefore, the agency conditioned its acceptance of PJM's proposal "on PJM revising its tariff and Operating Agreement to recognize a retail regulatory authority's ability to condition such eligibility, consistent with Order No. 719-A." *Id.*

The Tariff Order also addressed the particular mechanics of PJM's demand response program. Among other things, PJM proposed that the retail utility certify eligibility for retail customer participation. *See* Tariff Order P 46, JA __ (PJM proposed that the retail utility "submit evidence to PJM regarding participation rights"). Indiana responded that Order No. 719 "places the burden of providing such evidence on the aggregators of retail customers," not on the retail utility. *Id.* P 47 & n.29, JA ___ (citing Indiana Protest at 17, JA ___).

The Commission accepted PJM's favored method of certifying compliance with state eligibility requirements. In the Commission's view, PJM's proposal was "consistent with Order No. 719, which provides [Regional Transmission Organizations] . . . with substantial flexibility to develop procedures with respect to this issue." *Id.* P 50 & n.30, JA ___ (citing Order No. 719 P 158, JA ___).

12

### 3.  Subsequent Filings By The Parties

### a.  Indiana's Rehearing Request.

On October 14, 2009, Indiana filed its request for rehearing of the Tariff

Order, raising three precise issues.  Rehearing Request, JA ___.  (For the Court's

convenience, Indiana's Request for Clarification and Rehearing is provided as

Addendum B to this brief.)

First, Indiana observed that, on February 25, 2009, it had issued an order

prohibiting end-use customers from participating in Regional Transmission

Organization demand response programs absent its specific authorization.

Rehearing Request at 2, JA ___.  "Consequently," Indiana "request[ed]

clarification that the date from which PJM must recognize [its] authority over retail

customer participation in demand response is, at a minimum," February 25, 2009,

the date of its order.  *Id.*

Second, Indiana requested clarification that the Commission's Tariff Order

did not affect the right of any state commission to obtain confidential customer-

specific demand response information under PJM's Operating Agreement.

Rehearing Request at 3-4, JA ___-___.

Third, Indiana argued that aggregators of retail customers, rather than

electric distribution companies or load serving entities, should be required to

provide certification regarding the eligibility of retail customers in PJM's demand

response program.  Rehearing Request at 4, JA ___.  (For convenience, this brief refers generally to both electric distribution companies and load-serving entities as retail utilities.)  Indiana objected that "both Order No. 719-A and the [Tariff Order] indicate that PJM may place" the notification requirement on the retail utility, rather than the aggregator.  *Id.*  Indiana further alleged, without supporting argument, that such a requirement would be "an impingement on [its] jurisdictional authority over the retail utility," but primarily argued that the procedure would lead to regulatory uncertainty and confusion.  *Id.* at 5-6, JA ___-___.

Intervenor American Electric Power Service Corporation (American Electric Power) did not file a request for rehearing of the Tariff Order.

### b.  PJM's Revised Compliance Filing

On November 20, 2009, PJM submitted further proposed tariff revisions to comply with the requirements of both the Tariff Order and Order No. 719-A.  R 64, JA ___.  In this filing, PJM now requested an effective date of August 28, 2009 for its tariff revisions, reflecting the effective date of Order No. 719-A.  Indiana filed protests with the Commission in response to PJM's revised proposal.  R 74, JA ___; R 78, JA ___.

### 4.  The Rehearing Order

On April 23, 2010, the Commission issued its Rehearing Order, JA ___, addressing the three issues raised by Indiana in its rehearing request of the Tariff

14

Order.  (That order also addressed PJM's November 2009 revised compliance filing, along with objections to that filing by various parties, including Indiana.)

The Commission granted the clarification Indiana sought concerning the Tariff Order's treatment of confidential information, Rehearing Order P 9, JA ___, but denied its two other objections.

First, the Commission continued to allow PJM to require the retail utility, rather than the aggregator of retail customers, to certify consistency with state law and eligibility for demand response participation.  Rehearing Order PP 10-11, JA __-__.  The Commission found that PJM's approach is consistent with both its prior tariff as well as Order No. 719, which affords the Regional Transmission Organization considerable flexibility in developing such procedures.  *Id*. at P 10, JA __.  The Commission also concluded that PJM's approach is appropriately respectful of state retail regulatory authority, because state regulators have jurisdiction over the certifying retail utility.  *Id*.

Second, the Commission explained that because the proposed effective date of PJM's tariff amendments was now August 28, 2009, the only potential conflict with Indiana's February 25, 2009 prohibition deadline related to PJM's Reliability Pricing Model auctions, in which participants bid for capacity three years in the future.  Rehearing Order P 27-28, 36-37, JA ___-___, ___-___; *see also* Rehearing Order P 8, JA ___ (deciding to consider Indian's timing objection in the context of

15

the Commission's consideration of PJM's November 2009 compliance filing).  To

the extent that contracts had already been entered into for the May 2009 capacity

auction, the Commission rejected Indiana's request, approving the August 28, 2009

tariff effective date.  *Id.* P 51, JA ___.

Indiana filed a petition for review of the Tariff and Rehearing Orders in the

Seventh Circuit (No. 10-2512).  On PJM's motion, the Seventh Circuit transferred

Indiana's petition to this Court on August 27, 2010.

## SUMMARY OF ARGUMENT

1.  Indiana's arguments to this Court, advancing its mistaken belief that the

Commission has stripped state regulatory authorities of their ability to determine

demand response eligibility, are much different than those made below to the

agency.  Because Indiana failed to raise on rehearing the primary arguments it

pursues in its opening brief, this Court does not have jurisdiction to address them.

Indiana's primary contention on appeal is that the Commission's approval of

PJM's tariff revisions somehow employed a presumption that violated FERC

Order Nos. 719 and 719-A.  According to Indiana, the tariff revisions approved by

the Commission directly encroach on Indiana's authority to determine eligibility of

retail customers to participate in PJM's demand response program.

However, Indiana did not raise this issue on rehearing.  Nor did the

Commission adopt any improper presumption of demand response eligibility or

16

otherwise encroach on state retail jurisdiction.  To the contrary, the challenged orders modified PJM's proposal to ensure that Indiana and other state regulatory authorities retain the authority to determine whether (and how) retail customers may participate in PJM's demand response program.  If Indiana decides that its retail customers cannot so participate, the FERC orders on review respect that decision.

Indiana and intervenor American Electric Power also argue that the Commission exceeded its Federal Power Act jurisdiction by allowing PJM to require the retail utility, rather than the aggregator of retail customers, to notify the state retail authority regarding registration for PJM's demand response program. While Indiana referred in passing to this issue on rehearing, it failed to raise it with the specificity required by the statute, and American Electric Power filed no rehearing request.

In any event, the Commission explained in Order No. 719-A that its regulation of demand response programs in wholesale power markets, including authorizing notification of state authorities by retail utilities participating in those markets, is well within its Federal Power Act wholesale jurisdiction recognized by this Court.

2.  On the one issue Indiana properly preserved on appeal, it maintains that PJM's requirement that retail utilities notify state authorities regarding customer

17

participation in its demand response program is inefficient and confusing.  The

Commission reasonably rejected this contention, however, holding that the

notification procedure, which builds on PJM's previously-approved retail

registration process, is administratively convenient, consistent with FERC

regulations, and respectful of state authority.

## ARGUMENT

## I.    THE COURT LACKS JURISDICTION TO REVIEW THE ISSUES INDIANA FAILED TO RAISE ON REHEARING BEFORE THE COMMISSION.

As explained *supra* on pages 13-14, Indiana raised two issues on rehearing in which it did not receive complete relief from the Commission:  (1) that the date from which PJM must recognize Indiana's authority over retail customer participation in demand response should be earlier (February 25, 2009) rather than later (Rehearing Request at 1-3, JA ___-___); and (2) that aggregators of retail customers should be required to provide certification regarding customer eligibility because of the "regulatory uncertainty" that might occur by placing this responsibility on the retail utility (*id.* at 4-6, JA ___-___).

Indiana's brief makes only a fleeting reference in its Statement of the Facts, Pet. Br. 12, to the issue of the date on which PJM should be required to recognize its authority, but never pursues it further.  Therefore, Indiana has waived this argument on appeal.  *See, e.g., Duncan's Point Lot Owners Ass'n, Inc. v. FERC*, 522 F.3d 371, 377 (D.C. Cir. 2008) (court will not address an "asserted but unanalyzed argument" in a brief) (citing cases).

Indiana does advance the "regulatory uncertainty" argument in its brief, the merits of which are addressed in section II, *see infra* pages 26-30.  For the most part, however, Indiana's brief is devoted to two additional issues that it failed

19

properly to raise on rehearing.  Under well-established precedent, this Court has no

jurisdiction to reach these contentions.

### A. Indiana Did Not Seek Rehearing Of Its Claim That The Commission Approved Tariff Revisions Employing A Presumption Contrary To Its Regulations.

In its brief, Indiana first contends that "in the substantial revisions PJM

made to its tariff and registration processes, it added a presumption of retail

customer eligibility if the local distribution company fails to participate in the

object-and-prove process."  Pet. Br. 19.  Indiana goes on to argue extensively that

this presumption violates the regulations promulgated by the Commission in Order

Nos. 719 and 719-A, *id.* 20-21, and that the Commission failed adequately to

address this alleged deviation.  *Id.* 22-24, 26-28.

At the outset, it is interesting to note that Indiana acknowledges in its brief

that the contested Tariff Order "does contain paragraphs that suggest that, once

PJM knows a retail regulatory authority has prohibited retail customer

participation, PJM must comply and either not register or terminate any affected

registrations."  Pet. Br. 21 (citing Tariff Order, PP 21-24, JA ___-___, PP 35-36,

JA ___, P 40, JA ___).  Indeed, the Commission specifically held that PJM's tariff

revisions, made in compliance with the Tariff Order, "appropriately recognize the

right of a retail regulatory authority to condition the eligibility of retail customers

to participate in PJM's Demand Response Programs."  Rehearing Order P 23, JA

20

___; *see also* Tariff Order PP 13-15, 22, JA ___, ___ (respect for state retail

regulators and their authority to determine eligibility of retail customers for

demand response compels modification of PJM's tariff to allow states to determine

which retail customers may "opt out" and the conditions under which retail

customers may "opt in").  Because PJM is bound to interpret its tariff by the

language of the Commission's order approving it, Indiana's argument reduces to

little more than a plea for clarification that PJM's tariff be more "explicit."  Pet.

Br. 21.

  This Court is without jurisdiction, however, to consider Indiana's

clarification request.  In the Tariff Order, the Commission rejected as premature

Indiana's request to require PJM to "adopt specific language" in its tariff

recognizing a retail authority's ability to condition retail customer eligibility in

PJM's demand response program.  Tariff Order P 23, JA ___.  Rather, the agency

gave Indiana the opportunity to "renew its request, if it chooses, following PJM's

submission of its compliance filing."  *Id.*

  In the Rehearing Order, the Commission reiterated that, in the Tariff Order,

it had "declined to address [Indiana's] request that PJM adopt specific language" in

its tariff with respect to state regulatory authority, subject to Indiana's "right to

renew this issue following PJM's submission of its compliance filing (a filing we

address below)."  Rehearing Order P 8, JA___.  The Rehearing Order, therefore,

21

reviewed both: (1) Indiana's October 14, 2009 request for rehearing of the Tariff

Order; and (2) for the first time, PJM's November 20, 2009 revised compliance

filing. It is in the Rehearing Order that the Commission accepted PJM's tariff

revisions as consistent with Order No. 719-A. Rehearing Order P 23, JA ___.

Indiana did not seek rehearing of the Commission's acceptance of PJM's

new tariff language, first presented in the November 2009 revised compliance

filing, which allegedly contains the offending presumption. Nor did American

Electric Power or any other party. This is not surprising, since Indiana conceded in

its request for rehearing of the earlier Tariff Order that Order No. 719-A allows

PJM to "place this certification requirement" on the retail utility. Rehearing

Request at 4, JA ___.

Under section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), no

objection to the Commission's orders shall be considered on judicial review unless

it has "been urged before the Commission in the application for rehearing." As

this Court has recognized, the Act's rehearing requirement is a jurisdictional bar.

*Save Our Sebasticook v. FERC*, 431 F.3d 379, 381 (D.C. Cir. 2005); *City of*

*Orrville v. FERC*, 147 F.3d 979, 990 (D.C. Cir. 1998). *See also Apache Corp. v.*

*FERC*, 627 F.3d 1220, 1222 (D.C. Cir. 2010) (rejecting discrimination claim on

appeal that was not raised in rehearing request and was actually contrary to the

claim presented on rehearing; like here, petitioner's rehearing request "expressly

disavowed [its] current claim").

**B. Indiana Did Not Seek Rehearing Of Its Claim That The Commission's Approval Of PJM's Notification Procedure Exceeded The Agency's Jurisdiction.**

On brief, Indiana maintains that, by permitting PJM to require the retail utility, rather than the retail aggregator, to notify Indiana of customer participation in PJM's demand response programs, the Commission has invaded the jurisdictional authority reserved to the states under section 201(b)(1) of the Federal Power Act, 16 U.S.C. § 824(b)(1).  Pet. Br. 28-29.

However, the Court cannot reach this issue because, once again, Indiana did not properly preserve it in its rehearing request before the Commission.

On rehearing, Indiana stated solely that it "has argued and continues to assert that having the retail utility bear this certification requirement is an impingement on [Indiana's] jurisdictional authority over the retail utility."  Rehearing Request at 4-5, JA ___-___.  *See also* Pet. Br. 2 (Indiana "has consistently argued" this point). However, in its rehearing request, Indiana neither supports this argument with any discussion, nor references where it has previously done so.

As this Court has emphasized, "[u]nder [Federal Power Act] § 313(b) an objection cannot be preserved 'indirectly,'. . . but must be raised with specificity.'" *Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (quoting *Office of Consumers' Counsel v. FERC,* 914 F.2d 290, 295 (D.C. Cir. 1990), and

23

*Wisconsin Power & Light v. FERC*, 363 F.3d 453, 460 (D.C. Cir. 2004)).  To meet this requirement, "[p]arties are required to present their arguments to the Commission in such a way that the Commission knows 'specifically . . . the ground on which rehearing [is] being sought.'" *Constellation Energy Commodities Group v. FERC*, 457 F.3d 14, 22 (D.C. Cir. 2003) (quoting *Intermountain Mun. Gas Agency v. FERC*, 326 F.3d 1281, 1285 (D.C. Cir. 2003)).

Because Indiana did not raise its jurisdictional objection with any legal discussion whatsoever, the Commission can hardly be faulted for failing to address it in the Rehearing Order.  *See Intermountain Mun. Gas Agency*, 326 F.3d at 1285 (petitioner's "failure to specifically urge" its argument "in the rehearing petition is doubtless the reason FERC did not address the issue in its rehearing denial").

In any event, in the Order No. 719 rulemaking, the Commission fully considered jurisdictional objections to its requirement that Regional Transmission Organizations permit aggregators of retail customers to bid demand response on behalf of retail customers.  *See* Order No. 719-A PP 18-26, JA ___-___.  The Commission concluded that it could require these entities to accept demand response bids as part of its broad Federal Power Act authority to regulate practices affecting wholesale markets, rates and practices.  *Id.* PP 43-46, JA ___-___ (citing, *e.g.*, *Connecticut Dept. of Public Utility Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009)); *see also id.* P 52, JA ___ (emphasizing that the Commission's "rules cover

24

market bids from generators and from providers of demand response, which directly affect wholesale prices").

In so doing, the Commission acknowledged the objections of several parties that its Final Rule's demand response requirements "violate[] the separation of federal and state jurisdiction, by requiring load-serving entities, including public power systems and cooperative utilities, to take affirmative action to consider the issue of retail aggregation by [aggregators of retail customers]." Order No. 719-A P 49, JA ___. In the Commission's view, this point was not well-taken, in that its regulations "did not challenge the role of states and others to decide the eligibility of retail customers to provide demand response." *Id.*

Indiana offers no explanation of any alleged deficiency in the Commission's jurisdictional approach. Intervenor American Electric Power is more attentive, making the jurisdictional argument the primary focus of its brief. Int. Br. 12-15. As this Court has made clear, however, "absent extraordinary circumstances, intervenors may join issue only on a matter that has been brought before the court by a petitioner." *California Dept. of Water Resources v. FERC*, 306 F.3d 1121, 1126 (D.C. Cir. 2002) (quoting *Alabama Mun. Distribs. Group v. FERC*, 300 F.3d 877, 879 (D.C. Cir. 2002), and *Illinois Bell Tel. Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990)). While the Court has recognized an exception to this rule "if the intervenor has preserved the issue in its own petition for rehearing before the

25

Commission," *California Dept. of Water Resources,* 306 F.3d at 1126, thus

satisfying the statutory requirement for judicial review, American Electric Power

did not do so here.

There remains the one issue Indiana did properly preserve on appeal,

discussed in the next section.

## II.     THE COMMISSION REASONABLY APPROVED PJM'S TARIFF PROCEDURE REQUIRING RETAIL UTILITIES TO NOTIFY STATE COMMISSIONS OF DEMAND RESPONSE REGISTRATION.

### A.  Standard of Review

This Court "review[s] FERC's orders under the arbitrary and capricious

standard and uphold[s] FERC's factual findings if supported by substantial

evidence." *Sacramento Municipal Utility District v. FERC*, 616 F.3d 520, 528

(D.C. Cir. 2010) (quoting *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir.

2010)).  *See also, e.g.*, *Sithe/Independence Power Partners v. FERC*, 165 F.3d 944,

948 (D.C. Cir. 1999).  The Court will "affirm the Commission's orders so long as

FERC examine[d] the relevant data and articulate[d] a . . . rational connection

between the facts found and the choice made." *Sacramento Municipal Utility*

*District*, 616 F.3d at 528 (quoting *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C.

Cir. 2009)).

"The statutory requirement that rates be 'just and reasonable' is obviously

incapable of precise judicial definition, and [the Court] afford[s] great deference to

26

the Commission in its rate decisions." *Morgan Stanley Capital Group Inc. v. Pub. Util. Dist. No. 1*, 128 S. Ct. 2733, 2738 (2008). Moreover, this judicial deference to "rate decisions" encompasses a Commission decision about any terms and conditions affecting rates. *See City of Cleveland v. FERC*, 773 F.2d 1368, 1376 (D.C. Cir. 1985) (because "there is an infinitude of practices affecting rates and service . . . , [i]t is obviously left to the Commission, within broad bounds of discretion, to give concrete application to this amorphous directive.")

Additionally, "[i]n evaluating FERC's interpretation of its own orders, [the Court] afford[s] the Commission substantial deference, upholding the agency's decision 'unless its interpretation is plainly erroneous or inconsistent' with the order." *Consumers Energy Co. v. FERC*, 428 F.3d 1065, 1067-68 (D.C. Cir. 2005). The Court gives substantial deference to the Commission's interpretation of FERC-jurisdictional agreements as well. *See Old Dominion Elec. Coop. v. FERC*, 518 F.3d 43, 48-49 (D.C. Cir. 2008).

## B. The Commission's Decision Was A Reasonable Exercise Of Its Regulatory Discretion.

In the Tariff Order, the Commission held that PJM's proposal for placing the responsibility for providing evidence of state law or regulation regarding demand response on the retail utility was just and reasonable because it was "consistent with Order No. 719, which provides [Regional Transmission Organizations] . . .

27

with substantial flexibility to develop procedures with respect to this issue." Tariff
Order P 50 & n.30, JA ___ (citing Order No. 719 P 158, JA ___).

On rehearing, the Commission affirmed its holding. Rehearing Order P 10,
JA ____. First, the agency explained that because PJM's proposal was based on its
previously-approved retail utility registration procedure, it provided the advantage
of administrative convenience for all parties affected by the regulation. *Id.* P 11,
JA ___. "By contrast," the Commission observed, "shifting the responsibility for
an eligibility representation to the aggregator of retail customers would require the
implementation of a new, parallel process that could confuse, complicate, or delay
registrations." *Id.* This Court has recognized such regulatory convenience as a
proper consideration for the Commission. *See, e.g., Consolidated Edison Co. of
New York v. FERC*, 315 F.3d 316, 325 (D.C. Cir. 2003) (approving the
Commission's reliance on "administrative convenience" in determining
appropriate agency procedure)

In its brief, Indiana attacks PJM's registration system approved by the
Commission as "inefficient and confusing." Pet. Br. 25 (capitalization omitted).
But Indiana's support for this contention is limited to hypothetical questions
intended to demonstrate that its preferred procedure would somehow be less
confusing. *Id.* 25-26. Even if Indiana were able factually to demonstrate that
another procedure would be reasonable, however, it would provide no basis for the

28

Court to displace the Commission's decision.  *See, e.g., Blumenthal v. FERC*, 552

F.3d 875, 885 (D.C. Cir. 2009) (recognizing that the Commission must be "given

the latitude to balance competing considerations and decide on the best resolution"

concerning the "intensely practical difficulties" presented by an organized electric

market).

Indiana futher claims that the Commission's justification for approving

PJM's registration procedure would allow, in some unspecified manner, a violation

of Indiana law.  Pet. Br. 26.  To the contrary, the Commission acted to ensure that

PJM's procedure would not violate state law, but rather respect state authority over

retail utilities, "given that the retail utility" which would provide the registration

information "is subject to the authority of the retail regulator."  Rehearing Order P

11, JA ___.  "Given this direct regulatory nexus," the Commission explained, "we

are satisfied that the retail authority will be able to exercise its full regulatory

authority over the retail utility, as it deems appropriate." *Id.  See New York*, 535

U.S. at 28 (affirming this Court's holding that FERC decision not to interfere with

bundled retail transmission subject to state retail authority represents a "statutorily

permissible policy choice").

Indiana also complains that the Commission, by relying on PJM's previous

registration procedure, has somehow placed on Indiana the burden of showing that

the earlier process was unjust and unreasonable.  Pet. Br. 26-28.  (Intervenor

29

American Electric Power makes the same argument, Int. Br. at 16-17.)  However, nowhere in the contested orders does the Commission assign such a burden to Indiana or any other party to prove anything about the PJM's earlier registration process.  Rather, as described above, the Commission simply determined that it made sense for PJM to comply with Order No. 719 by revising the retail utility registration process it already had in place.

In sum, Indiana advances no ground adequate for the Court to disturb the Commission's finding that PJM's registration process appropriately respects Indiana's role, as the retail regulatory authority, to determine retail eligibility in PJM's demand response program.

## CONCLUSION

For the reasons stated, the Court should dismiss the petition for review for lack of jurisdiction on the issues that were not properly preserved for appeal, and deny the petition and affirm the Commission's orders in all other respects.

Respectfully submitted,

Michael A. Bardee
General Counsel


Robert H. Solomon
Solicitor


*/s/ Samuel Soopper*
Samuel Soopper
Attorney


Federal Energy Regulatory
  Commission
Washington, DC   20426
TEL:  (202) 502-8134
FAX: (202) 273-0901


March 9, 2011

31

*Indiana Utility Regulatory Commission*                    Docket No. ER09-701
  *v. FERC*
D.C. Cir. No. 10-1313

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I hereby certify that the

Brief of Respondent contains 6,347 words, not including the tables of contents and

authorities, the glossary, the certificate of counsel and the addendum.

/s/ *Samuel Soopper*
Samuel Soopper
Attorney

Federal Energy Regulatory
  Commission
Washington, DC  20426
Tel:  (202) 502-8154
Fax:  (202) 273-0901
samuel.soopper@ferc.gov

March 9, 2011

# ADDENDUM A
# Statutes & Regulations

# TABLE OF CONTENTS

**PAGE**

Addendum A:

STATUTES

Energy Policy Act

     16 U.S.C. § 2642(f)……………………………………………...…A-1

Federal Power Act

     Section 201(b)(1), 16 U.S.C. § 824(b)(1)................................A-2-A-3

     Section 205(a)-(b), 16 U.S.C. §§ 824d(a)-(b)……………………...A-4

     Section 206, 16 U.S.C. § 824e(a)……………………………A-5-A-6

     Section 313(b), 16 U.S.C. § 825*l*(b)................................................A-7

REGULATIONS

     18 C.F.R. § 35.28(b)(4)……………………………………………A-8

     18 C.F.R. § 35.28(g)(1)(iii)……………………………………...A-9

Addendum B

     Petitioner's Request For Clarification and Rehearing………...B-1-B-6

119 STAT. 966          PUBLIC LAW 109–58—AUG. 8, 2005

(B) identifying and resolving problems in transmission and distribution networks, including through the use of demand response;

(C) developing plans and programs to use demand response to respond to peak demand or emergency needs; and

(D) identifying specific measures consumers can take to participate in these demand response programs.

(3) REPORT.—Not later than 1 year after the date of enactment of the Energy Policy Act of 2005, the Commission shall prepare and publish an annual report, by appropriate region, that assesses demand response resources, including those available from all consumer classes, and which identifies and reviews—

(A) saturation and penetration rate of advanced meters and communications technologies, devices and systems;

(B) existing demand response programs and time-based rate programs;

(C) the annual resource contribution of demand resources;

(D) the potential for demand response as a quantifiable, reliable resource for regional planning purposes;

(E) steps taken to ensure that, in regional transmission planning and operations, demand resources are provided equitable treatment as a quantifiable, reliable resource relative to the resource obligations of any load-serving entity, transmission provider, or transmitting party; and

(F) regulatory barriers to improve customer participation in demand response, peak reduction and critical period pricing programs.

(f) FEDERAL ENCOURAGEMENT OF DEMAND RESPONSE DEVICES.—It is the policy of the United States that time-based pricing and other forms of demand response, whereby electricity customers are provided with electricity price signals and the ability to benefit by responding to them, shall be encouraged, the deployment of such technology and devices that enable electricity customers to participate in such pricing and demand response systems shall be facilitated, and unnecessary barriers to demand response participation in energy, capacity and ancillary service markets shall be eliminated. It is further the policy of the United States that the benefits of such demand response that accrue to those not deploying such technology and devices, but who are part of the same regional electricity entity, shall be recognized.

Deadlines.

(g) TIME LIMITATIONS.—Section 112(b) of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2622(b)) is amended by adding at the end the following:

"(4)(A) Not later than 1 year after the enactment of this paragraph, each State regulatory authority (with respect to each electric utility for which it has ratemaking authority) and each nonregulated electric utility shall commence the consideration referred to in section 111, or set a hearing date for such consideration, with respect to the standard established by paragraph (14) of section 111(d).

"(B) Not later than 2 years after the date of the enactment of this paragraph, each State regulatory authority (with respect to each electric utility for which it has ratemaking authority),

A-1

with the purposes of this subchapter, or other applicable law, the Commission may refer the dispute to the Commission's Dispute Resolution Service. The Dispute Resolution Service shall consult with the Secretary and the Commission and issue a non-binding advisory within 90 days. The Secretary may accept the Dispute Resolution Service advisory unless the Secretary finds that the recommendation will not adequately protect the reservation. The Secretary shall submit the advisory and the Secretary's final written determination into the record of the Commission's proceeding.

**(b) Alternative prescriptions**

(1) Whenever the Secretary of the Interior or the Secretary of Commerce prescribes a fishway under section 811 of this title, the license applicant or any other party to the license proceeding may propose an alternative to such prescription to construct, maintain, or operate a fishway.

(2) Notwithstanding section 811 of this title, the Secretary of the Interior or the Secretary of Commerce, as appropriate, shall accept and prescribe, and the Commission shall require, the proposed alternative referred to in paragraph (1), if the Secretary of the appropriate department determines, based on substantial evidence provided by the license applicant, any other party to the proceeding, or otherwise available to the Secretary, that such alternative—

　(A) will be no less protective than the fishway initially prescribed by the Secretary; and
　(B) will either, as compared to the fishway initially prescribed by the Secretary—
　　(i) cost significantly less to implement; or
　　(ii) result in improved operation of the project works for electricity production.

(3) In making a determination under paragraph (2), the Secretary shall consider evidence provided for the record by any party to a licensing proceeding, or otherwise available to the Secretary, including any evidence provided by the Commission, on the implementation costs or operational impacts for electricity production of a proposed alternative.

(4) The Secretary concerned shall submit into the public record of the Commission proceeding with any prescription under section 811 of this title or alternative prescription it accepts under this section, a written statement explaining the basis for such prescription, and reason for not accepting any alternative prescription under this section. The written statement must demonstrate that the Secretary gave equal consideration to the effects of the prescription adopted and alternatives not accepted on energy supply, distribution, cost, and use; flood control; navigation; water supply; and air quality (in addition to the preservation of other aspects of environmental quality); based on such information as may be available to the Secretary, including information voluntarily provided in a timely manner by the applicant and others. The Secretary shall also submit, together with the aforementioned written statement, all studies, data, and other factual information available to the Secretary and relevant to the Secretary's decision.

(5) If the Commission finds that the Secretary's final prescription would be inconsistent

with the purposes of this subchapter, or other applicable law, the Commission may refer the dispute to the Commission's Dispute Resolution Service. The Dispute Resolution Service shall consult with the Secretary and the Commission and issue a non-binding advisory within 90 days. The Secretary may accept the Dispute Resolution Service advisory unless the Secretary finds that the recommendation will not adequately protect the fish resources. The Secretary shall submit the advisory and the Secretary's final written determination into the record of the Commission's proceeding.

(June 10, 1920, ch. 285, pt. I, §33, as added Pub. L. 109–58, title II, §241(c), Aug. 8, 2005, 119 Stat. 675.)

SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

**§824. Declaration of policy; application of subchapter**

**(a) Federal regulation of transmission and sale of electric energy**

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

**(b) Use or sale of electric energy in interstate commerce**

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with re-

spect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, § 201, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 847; amended Pub. L. 95–617, title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985.)

REFERENCES IN TEXT

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, as amended, which is classified generally to chapter 31 (§ 901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§ 16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

AMENDMENTS

2005—Subsec. (b)(2). Pub. L. 109–58, § 1295(a)(1), substituted "Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, § 1295(a)(2), substituted "section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, § 1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) of this section shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78*l*, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

**§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and de-

livering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

  (A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

  (B) whether any such clause reflects any costs other than costs which are—

    (i) subject to periodic fluctuations and

    (ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

  (A) modify the terms and provisions of any automatic adjustment clause, or

  (B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142.)

AMENDMENTS

1978—Subsec. (d). Pub. L. 95–617, § 207(a), substituted "sixty" for "thirty" in two places.

Subsec. (f). Pub. L. 95–617, § 208, added subsec. (f).

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL
POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anti-competitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

**§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission**

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate,

charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies

of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.[1]

**(d) Investigation of costs**

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e) Short-term sales**

(1) In this subsection:

(A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

(B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

(A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

(B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by

---

[1] See References in Text note below.

Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

## § 825l. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceed-

ings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

### (c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

CODIFICATION

In subsec. (b), ''section 1254 of title 28'' substituted for ''sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)'' on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58 inserted ''electric utility,'' after ''Any person,'' and ''to which such person,'' and substituted ''brought by any entity unless such entity'' for ''brought by any person unless such person''.

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted ''transmitted by the clerk of the court to'' for ''served upon'', substituted ''file with the court'' for ''certify and file with the court a transcript of'', and inserted ''as provided in section 2112 of title 28'', and in third sentence, substituted ''jurisdiction, which upon the filing of the record with it shall be exclusive'' for ''exclusive jurisdiction''.

CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted ''court of appeals'' for ''circuit court of appeals''.

## § 825m. Enforcement provisions

### (a) Enjoining and restraining violations

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this

**Federal Energy Regulatory Commission**                    **§ 35.28**

Commission order resolving the disputed issues, the customer may reevaluate its decision in paragraph (c)(5)(i) of this section to exercise the marketing or brokering option. The customer must notify the utility in writing within 30 days of issuance of the Commission's order resolving the disputed issues whether the customer will market or broker a portion or all of the capacity and energy associated with stranded costs allowed by the Commission.

(iii) If a customer undertakes the brokering option, and the customer's brokering efforts fail to produce a buyer within 60 days of the date of the brokering agreement entered into between the customer and the utility, the customer shall relinquish all rights to broker the released capacity and associated energy and will pay stranded costs as determined by the formula in paragraph (c)(2)(iii) of this section.

(d) *Recovery of retail stranded costs*—1) *General requirement.* A public utility may seek to recover retail stranded costs through rates for retail transmission services only if the state regulatory authority does not have authority under state law to address stranded costs at the time the retail wheeling is required.

(2) *Evidentiary demonstration necessary for retail stranded cost recovery.* A public utility seeking to recover retail stranded costs in accordance with paragraph (d)(1) of this section must demonstrate that:

(i) It incurred costs to provide service to a retail customer that obtains retail wheeling based on a reasonable expectation that the utility would continue to serve the customer; and

(ii) The stranded costs are not more than the customer would have contributed to the utility had the customer remained a retail customer of the utility.

[Order 888–A, 62 FR 12460, Mar. 14, 1997]

**§ 35.27  Authority of State commissions.**

Nothing in this part—

(a) Shall be construed as preempting or affecting any jurisdiction a State commission or other State authority may have under applicable State and Federal law, or

(b) Limits the authority of a State commission in accordance with State and Federal law to establish

(1) Competitive procedures for the acquisition of electric energy, including demand-side management, purchased at wholesale, or

(2) Non-discriminatory fees for the distribution of such electric energy to retail consumers for purposes established in accordance with State law.

[Order 697, 72 FR 40038, July 20, 2007]

**§ 35.28  Non-discriminatory open access transmission tariff.**

(a) *Applicability.* This section applies to any public utility that owns, controls or operates facilities used for the transmission of electric energy in interstate commerce and to any non-public utility that seeks voluntary compliance with jurisdictional transmission tariff reciprocity conditions.

(b) *Definitions*—(1) *Requirements service agreement* means a contract or rate schedule under which a public utility provides any portion of a customer's bundled wholesale power requirements.

(2) *Economy energy coordination agreement* means a contract, or service schedule thereunder, that provides for trading of electric energy on an "if, as and when available" basis, but does not require either the seller or the buyer to engage in a particular transaction.

(3) *Non-economy energy coordination agreement* means any non-requirements service agreement, except an economy energy coordination agreement as defined in paragraph (b)(2) of this section.

(4) *Demand response* means a reduction in the consumption of electric energy by customers from theirexpected consumption in response to an increase in the price of electric energy or to incentive paymentsdesigned to induce lower consumption of electric energy.

(5) *Demand response resource* means a resource capable of providing demand response.

(6) *An operating reserve shortage* means a period when the amount of available supply falls short ofdemand plus the operating reserve requirement.

(7) *Market Monitoring Unit* means the person or entity responsible for carrying out the market monitoringfunctions that the Commission has ordered Commission-approved

311

**Federal Energy Regulatory Commission**                                   **§ 35.28**

(3) A public utility subject to the requirements of this paragraph pertaining to the Final Rule on Generator Interconnection may file a request for waiver of all or part of the requirements of this paragraph, for good cause shown. An application for waiver must be filed either:

(i) No later than January 20, 2004, or

(ii) No later than 60 days prior to the time the public utility would otherwise have to comply with the requirements of this paragraph.

(4) A public utility subject to the requirements of this paragraph pertaining to the Final Rule on Small Generator Interconnection may file a request for waiver of all or part of the requirements of this paragraph, for good cause shown. An application for waiver must be filed either:

(i) No later than August 12, 2005, or

(ii) No later than 60 days prior to the time the public utility would otherwise have to comply with the requirements of this paragraph.

(g) *Tariffs and operations of Commission-approved independent system operators and regional transmission organizations.*

(1) *Demand response and pricing.*

(i) *Ancillary services provided by demand response resources.*

(A) Every Commission-approved independent system operator or regional transmission organization that operates organized markets based on competitive bidding for energy imbalance, spinning reserves, supplemental reserves, reactive power and voltage control, or regulation and frequency response ancillary services (or its functional equivalent in the Commission-approved independent system operator's or regional transmission organization's tariff) must accept bids from demand response resources in these markets for that product on a basis comparable to any other resources, if the demand response resource meets the necessary technical requirements under the tariff, and submits a bid under the Commission-approved independent system operator's or regional transmission organization's bidding rules at or below the market-clearing price, unless not permitted by the laws or regulations of the relevant electric retail regulatory authority.

(B) Each Commission-approved independent system operator or regional transmission organization must allow providers of a demand response resource to specify the following in their bids:

(*1*) A maximum duration in hours that the demand response resource may be dispatched;

(*2*) A maximum number of times that the demand response resource may be dispatched during a day; and

(*3*) A maximum amount of electric energy reduction that the demand response resource may be required to provide either daily or weekly.

(ii) *Removal of deviation charges.* A Commission-approved independent system operator or regional transmission organization with a tariff that contains a day-ahead and a real-time market may not assess a charge to a purchaser of electric energy in its day-ahead market for purchasing less power in the real-time market during a real-time market period for which the Commission-approved independent system operator or regional transmission organization declares an operating reserve shortage or makes a generic request to reduce load to avoid an operating reserve shortage.

(iii) *Aggregation of retail customers.* Each Commission-approved independent system operator and regional transmission organization must permit a qualified aggregator of retail customers to bid demand response on behalf of retail customers directly into the Commission-approved independent system operator's or regional transmission organization's organized markets, unless the laws and regulations of the relevant electric retail regulatory authority expressly do not permit a retail customer to participate.

(iv) *Price formation during periods of operating reserve shortage.*

(A) Each Commission-approved independent system operator or regional transmission organization must modify its market rules to allow the market-clearing price during periods of operating reserve shortage to reach a level that rebalances supply and demand so as to maintain reliability while providing sufficient provisions for mitigating market power.

315

A-9

# ADDENDUM B
# Petitioner's Request For Clarification and Rehearing

# UNITED STATES OF AMERICA
# BEFORE THE
# FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.           )                    Docket Nos. ER09-701-000
                                                              and   ER09-701-001

## REQUEST FOR CLARIFICATION AND REHEARING
## FROM THE INDIANA UTILITY REGULATORY COMMISSION

Pursuant to Rule 713 of the Federal Energy Regulatory Commission ("FERC" or "Commission"), 18 C.F.R. § 385.713, the Indiana Utility Regulatory Commission ("IURC") submits its Request for Clarification and Rehearing in the above captioned Dockets.

**Statement of Issues**

On September 14, 200 9, the Commission issued its Order Conditionally Accepting Proposed Tariff Revisions[1] ("PJM Order") in the above captioned Dockets. The IURC seeks clarification regarding, and to preserve its rights pursuant to a Request for Rehearing to raise, the following issues:

1) **Jurisdictional Authority to Regulate Retail Customers Supersedes PJM Tariff.**

   In Order Nos. 719 and 719-A, FERC has clearly established that it is not challenging the role of states and others to decide the eligibility of retail customers to participate in wholesale demand response programs.[2] In the PJM Order, the Commission

---

[1] Order Conditionally Accepting Proposed Tariff Revisions, *PJM Interconnection, L.L.C.,* Docket Nos. ER09-701-000 and ER09-701-001, 128 F.E.R.C. P61,238 (Sep. 14, 2009) ("PJM Order").

[2] *Wholesale Competition in Regions with Organized Electric Markets,* Order No. 719, 125 F.E.R.C. P61,071 , ¶ 155 (*Oct. 17, 2008*), *Order on Rehearing*, Order No. 719-A, 128 F.E.R.C. P61,059, ¶ 49 and ¶ 54 (Jul. 16, 2009).

1

requires the PJM Interconnection, L.L.C. ("PJM") to revise its tariff filing[3] to recognize a retail regulatory authority's ability to condition the eligibility of retail customers.[4]  The only requirement the Commission placed on a retail regulatory authority is that the decision, policy or condition regarding retail customer eligibility be "clear and explicit."[5]  As discussed in multiple filings in these dockets, on February 25, 2009, the IURC approved an Order on Requests for Interim Relief ("IURC Order") that clearly and explicitly stated:

> Indiana end-use customers are prohibited from participating in RTO demand response programs until further order of the [IURC], unless such end-use customer has filed a petition for and received, after hearing, an order of the [IURC] authorizing such participation.

PJM had ample notice of the IURC Order, both from the filings of the IURC in these FERC dockets and as a participant in the IURC docket in which the IURC Order was issued.   In addition, the policy of the IURC in this regard has not changed since first raised in 2005 and was acknowledged and honored by PJM from 2005 until 2008.

Consequently, the IURC requests clarification that the date from which PJM must recognize IURC authority over retail customer participation in demand response is, at a minimum, the date of the IURC Order (February 25, 2009) and not some yet-to-be-determined future date when PJM's tariff revisions on this subject are approved by the Commission.

The IURC supports demand response and is currently investigating ways to encourage additional demand response in Indiana.  However, participation in any

---

[3] The IURC suggests for PJM's consideration that PJM look at the recent filing by the Midwest Independent Transmission System Operator, Inc., ("Midwest ISO") in FERC Docket No. ER09-1049-002 for guidance on acceptable tariff language.
[4] PJM Order at ¶ 22.
[5] *Id.*

demand response program by Indiana end-use customers must be in accordance with Indiana laws and regulations.

At this point in time, the IURC is willing to take at face value PJM's statements that PJM will honor a retail regulatory authority's customer eligibility requirements and that PJM will work with state regulators on these issues.[6] Any issues regarding Indiana end-use customers that were registered in PJM demand response programs or in the PJM Reliability Pricing Model capacity auction in a manner contrary to Indiana law and the IURC's Order in Cause No. 43566 should be resolved through the existing IURC docket on these matters.[7] However, the IURC reiterates that the latest date on which the IURC provided clear and explicit direction on this matter was February 25, 2009, not some future date to be determined based on PJM making compliant tariff filings.

2) **State Commissions Authorized Pursuant to the PJM Confidentiality Certification Process Have the Right to Obtain Confidential Customer-Specific Demand Response Information**.  In response to an argument by the Indiana Office of Utility Consumer Counselor that PJM should provide customer-specific enrollment information, the Commission stated in the PJM Order that PJM "should not be required to disclose customer-specific confidential or proprietary information regarding demand response participation."[8]  The IURC requests clarification that the PJM Order does not impinge in any way on Section 18.17.4 of PJM's Operating

---

[6] PJM Order at ¶ 30-31
[7] IURC Docket No. 43566.
[8] *Id*. at ¶ 45.

3

Agreement, in which a state utility commission that provides the requisite confidentiality certification has the right to obtain confidential information from PJM.

The Commission has stated that it is up to the retail regulatory authority to enforce its own laws and regulations. In order to do so, it is essential to have the ability to obtain the necessary information to determine if violations have occurred and the extent of any violation. The IURC understands the need to protect confidential and proprietary customer-specific information and has the ability to do so under Indiana law. The IURC recently filed with FERC a confidentiality certification under PJM's tariff without objection.[9] FERC should clarify that its statement in the PJM Order regarding access to customer-specific demand response information does not affect any rights of a state commission to obtain that information under PJM's Operating Agreement.

**3) Aggregators of Retail Customers Should Be Required to Provide Certification Regarding Customer Eligibility Requirements.** Order No. 719 indicated that the RTO/ISO could place registration requirements on an aggregator of retail customers ("ARC"), including that the ARC provide certification that participation is not precluded by the relevant electric retail regulatory authority.[10] However, both Order No. 719-A and the PJM Order indicate that PJM may place this certification requirement on the electric distribution company or load-serving entity. The IURC has argued and continues to assert that having the retail utility bear this certification requirement is an impingement on the IURC's jurisdictional authority over the retail

---

[9] *See* Indiana Utility Regulatory Commission state certification pursuant to 18.17.4 of the PJM Operating Agreement, FERC Document No. 20090917-5030, filed in *Allegheny Electric Cooperative, Inc., et al. v. PJM Interconnection, L.L.C.*, FERC Docket No. EL07-56-009, and *Organization of PJM States, Inc., et al. v. PJM Interconnection L.L.C.*, FERC Docket No. EL07-58-009.
[10] Order No. 719 at ¶ 158.

4

utility. However, in the past month, the IURC has learned of an additional reason why the certification requirement should be placed on the ARC and that is to assure the ARC is aware of and provides information to the customer it is aggregating regarding the customer eligibility requirements of the retail regulatory authority.

As has been frequently discussed in filings to FERC and in FERC technical conferences, regulatory uncertainty is often cited as a barrier to participation, whether it is with regards to large transmission projects or to retail customer participation in wholesale demand response programs. Regulatory uncertainty is caused not only by unclear or changing state or federal regulations, but is also caused by incomplete knowledge or lack of knowledge about what are otherwise clear and established regulations.

The Commission has stated it is not the RTO's responsibility to interpret state laws and regulations.[11] PJM has placed the certification responsibility on the entity that in a traditionally regulated state like Indiana is the local state regulated utility.[12] Unfortunately, under PJM's demand response programs and its proposed registration methods, even though both PJM and the local utility have the knowledge regarding a state's customer eligibility requirements, neither have direct contact to share that knowledge with the participating end-use customer at the time the customer is registered through an ARC. This creates a greater likelihood of confusion, miscommunication, and frustration that can thwart an end-use customer's ability and motivation to participate in demand response. Such an instance appears to have happened in Indiana in the past month, with regards to an Indiana end-use customer

---

[11] *Id.* at ¶ 158, n 212, and Order No. 719-A at ¶ 50.
[12] PJM Order at ¶ 46.

and an aggregator whose registration was accepted by PJM even though neither the customer nor the aggregator had complied with Indiana's clear and explicit requirement of obtaining IURC approval. The customer claimed verbally that it had never been told not only of the requirement of IURC approval, but it had also never been told of the situations in which the customer would actually be required to reduce load. While it is still unclear what caused the confusion, this type of regulatory uncertainty and barrier to participation could have been avoided if PJM had placed the certification requirement on the ARC, rather than on the retail utility.[13]

WHEREFORE, the IURC respectfully requests that the Commission provide clarification regarding the above described issues and grant the IURC's Request for Rehearing.

<div style="margin-left:40%;">

Respectfully submitted,

_____/s/_____

*Beth Krogel Roads*
*Legal Counsel, RTO/FERC Issues*
*Scott R. Storms*
*General Counsel*
**Indiana Utility Regulatory Commission**
**101 W. Washington Street, Suite 1500 E**
**Indianapolis, Indiana 46024**
**317-232-2092**

</div>

---

[13] Again, the IURC would ask that PJM consider the proposed tariff language recently filed by the Midwest ISO in FERC Docket No. ER09-1049-002.

6

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated

on the official service list via electronic mail compiled by the Secretary in this proceeding.

Dated at Indianapolis, Indiana this 14th day of October, 2009.

_____/s/_____
Beth Krogel Roads

*Indiana Utility Regulatory Comm'n v. FERC*      **Docket No. ER09-701**
**D.C. Cir. No. 10-1313**

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P.25(d), and the Court's Administrative

Order Regarding Electronic Case Filing, I hereby certify that I have, this 9th day of

March 2011, served the foregoing upon the counsel listed in the Service Preference

Report via email through the Court's CM/ECF system or via U.S. Mail, as

indicated below:

Barry S. Spector                          Email
Wright & Talisman, P.C.
1200 G Street, NW
Suite 600
Washington, DC  20005

Beth K. Roads                             US Mail
Indiana Utility Regulatory Comm.
101 W. Washington St.
Suite 1500E
Indianapolis, IN  46204

Eric A. Eisen                             Email
Eisen & Shapiro
10028 Woodhill Road
Bethesda, MD  20817-1218

Gary J. Newell                            Email
Thompson Coburn
1909 K Street, NW
Suite 600
Washington, DC  20006-1167

Randolph L. Elliott                              Email
Miller, Balis & O'Neil, P.C.
1015 15th Street, NW
Suite 1200
Washington, DC  20005-0000


Robert A. Weishaar, Jr.                          Email
McNees Wallace & Nurick, LLC
777 N. Capitol Street, NE
Suite 401
Washington, DC  20002-0000


Steven J. Ross                                   Email
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036-1795


Steven T. Nourse                                 US Mail
American Electric Power Service
   Corporation
1 Riverside Plaza
Columbus, OH  43215



                    /s/ Samuel Soopper
                      Samuel Soopper
                         Attorney


Federal Energy Regulatory
   Commission
Washington, DC  20426
Tel:  (202) 502-8154
Fax:  (202) 273-0901
Email: samuel.soopper@ferc.gov